EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANGEL ORTIZ PEPÍN, acusado y apelante.

*Número:* CR-76-37      *Resuelto:* 17 de enero de 1977

*Santos P. Amadeo, Ramón Rivera Valentín* y *José Enrique Amadeo,* abogados del apelante; *Miriam Naveira de Rodón, Procuradora General, Roberto Armstrong, Jr., Procurador General Interino,* y *Mario L. Paniagua, Procurador General Auxiliar,* abogados de El Pueblo.

### SENTENCIA

El apelante fue convicto por cinco infracciones a la Ley de Sustancias Controladas consistentes en haber poseído, transportado y distribuido la sustancia conocida como marihuana en tres fechas distintas y sentenciado a cumplir penas de cinco a ocho años de presidio por los cargos de transportación y distribución y de uno a tres años de presidio por los cargos de posesión y posesión con intención de transportar y distribuir dicha droga.* Dispuso el tribunal que dichas penas se cumplirían concurrentemente. No conforme con los fallos condenatorios el apelante nos pide la revocación señalando cinco errores alegadamente cometidos por el tribunal de instancia. Todos los errores son inmeritorios y a continuación expondremos los fundamentos de nuestra conclusión.

---

* NOTA DEL COMPILADOR: Con fecha 20 de enero de 1977 el Tribunal Supremo de Puerto Rico emitió la siguiente Orden en el caso de autos:

"Se enmienda *nunc pro tunc* nuestra sentencia de 17 de enero de 1977 a los efectos de eliminar de la página primera de la misma, línea seis, lo siguiente: 'y posesión con intención de transportar y distribuir dicha droga.'

"Lo acordó el Tribunal y certifica el Secretario.

(Fdo.) Ernesto L. Chiesa

*Secretario"*

1. El apelante sostiene que las disposiciones de la Ley de Sustancias Controladas relativas a la marihuana violan la cláusula del debido proceso de ley y de la igual protección de las leyes al clasificar y castigar la posesión, traspaso, ocultación y transportación de la marihuana al igual que la heroína y la cocaína sin ser aquélla como son éstas drogas narcóticas y adictivas.

El apelante apoya su apuntamiento en lo resuelto por el Tribunal Supremo del Estado de Illinois en los casos de *People* v. *McCabe*, 275 N.E.2d 407 y *People* v. *Hudson*, 59 Ill.2d 1, pero ninguno de ellos es de aplicación. (¹) La impugnación de la validez del estatuto la hace el apelante por primera vez en su recurso de apelación sin haber planteado previamente la cuestión al tribunal de instancia ni haberse ventilado esta en forma alguna. Tal omisión impide levantar la cuestión en esta etapa de los procedimientos.

2. Notamos que hay una total incongruencia entre el segundo señalamiento de error y la discusión del mismo. En el señalamiento se impugnan las sentencias dictadas "porque no siendo la marihuana, como son la cocaína y la heroína una droga narcótica y adictiva constituiría un castigo cruel e inusitado en violación de la Quinta Enmienda de la Constitución de los Estados Unidos, el imponérsele a un acusado convicto y sentenciado por poseer y tener bajo su dominio, traspasar, ocultar y transportar y vender una cantidad de heroína o cocaína, que son drogas narcóticas y adictivas de acuerdo con la ley y la ciencia." El apuntamiento es muy confuso y no indica claramente su alcance. En la discusión del mismo el apelante meramente se limita a señalar que como no se ha probado científicamente que la marihuana no es tan nociva como el uso de bebidas alcohólicas el Estado está impedido de imponer castigos más severos por la posesión, trans-

---

(¹) En el caso de *McCabe* se presentó al tribunal de instancia voluminosa prueba sobre la inconstitucionalidad del estatuto lo que no sucede aquí.

portación, distribución y ocultación y venta de marihuana, que por los mismos actos cometidos en casos de bebidas alcohólicas. Es decir, en el apuntamiento se refiere a la comparación entre la marihuana y la cocaína y la heroína mientras que en la discusión del apuntamiento se refiere a la comparación de aquéllas con bebidas alcohólicas. Nada aduce el apelante para sostener su apuntamiento de error, aparte de que no sólo no levanta la cuestión en el tribunal de instancia ni presentó prueba que permitiera a éste considerar en alguna forma el planteamiento.

3. Impugna el apelante los fallos condenatorios porque no se probó más allá de duda razonable que la marihuana fuese de la especie "cannabis sativa L" como lo requiere el Art. 101, inciso 116 de la Ley Núm. 4 de 23 de junio de 1971. La prueba presentada por el Ministerio Público demostró más allá de duda razonable que la sustancia ocupada al apelante era marihuana. El apelante no presentó prueba pericial alguna para refutar dicha prueba. El apuntamiento es frívolo.

4. El apelante impugna en el cuarto señalamiento la suficiencia de la prueba para sostener los fallos condenatorios. Arguye que el agente Lassalle testificó que al entrar a la casa detrás del apelante éste prendió la luz y, sin embargo, en la declaración jurada que presentó ante el fiscal omitió ese hecho.

El examen detenido que hemos hecho de la prueba nos convence que la omisión no tiene la importancia que le imparte el apelante en su alegato. Estamos convencidos de que la prueba de ser creída como lo fue, es suficiente para sostener dicho fallo.

5. Se impugna la renuncia a juicio por jurado por no haber sido hecha inteligentemente. El apuntamiento es inmeritorio y basta para demostrarlo el siguiente extracto del récord:

"LIC. FIGUEROA VÉLEZ:

Su Señoría, en los casos que se han llamado yo he conversado con el acusado con anterioridad al día de hoy. Precisamente surgió del informe que él deseaba que sus casos se vieran por tribunal de derecho. En el día de hoy hemos podido conversar con él y constatar. Precisamente el acusado está en esa misma actitud y disposición de que sus casos se vean por tribunal de derecho. . . .

Le he explicado, V.H., que el derecho a juicio por jurado es un derecho constitucional que únicamente lo puede renunciar el acusado. El abogado lo que puede es explicarle en qué consiste ese derecho, recomendarle, asesorarlo, pero el derecho es un derecho inherente del acusado, de él, y que, por lo tanto, únicamente él lo puede renunciar.

Le he explicado, además, que ese derecho consiste en que el acusado, representado por su abogado, participa en la selección del jurado preguntándole y cualificándolo para determinar aquel jurado que finalmente le va a juzgar en una forma imparcial. Que en ese proceso participa el Señor Fiscal y el Hon. Juez. Que una vez juramentadas esas doce personas que son las que constituyen el jurado, escuchan la prueba que desfila por la silla de los testigos y ellos y únicamente ellos son los juzgadores de los hechos para decidir si el acusado es inocente o culpable, conforme a las instrucciones de ley que les diera V.H.

Que para que exista un veredicto, sea en favor de una absolución o sea condenatorio, tienen que concurrir, como mínimo de las doce personas, nueve, o sea, nueve personas, nueve votos constituyen un veredicto, sea absolutorio o sea condenatorio.

Le he explicado, además, que la alternativa es únicamente que sea V.H. quien decida la inocencia o culpabilidad y quien decida, además, las cuestiones de ley.

El acusado insiste que desea que sea V.H. quien lo juzgue y así lo informo a V.H.

HON. JUEZ:

Señor Angel Ortiz Pepín, usted ha estado escuchando a su abogado indicar que usted renuncia a su derecho a ser juzgado por jurado?

SEÑOR ACUSADO:

Sí, señor.

Hon. Juez:

¿Usted efectivamente renuncia a ese derecho constitucional suyo a ser juzgado por jurado?

R Sí, señor.

P ¿El le ha explicado a usted la diferencia entre un juicio por jurado y un juicio por tribunal de derecho?

R Sí, señor.

Hon. Juez:

Como quiera que sea, el Tribunal le va a dar una explicación. Mire, el juicio por jurado es aquel que se celebra ante un grupo de damas y caballeros que son seleccionados de entre ese grupo que está aquí, mire, ahí atrás, ese grupo que está ahí. Entre ellos se escogen doce. Entre el Fiscal y la defensa seleccionan doce de ellos y ellos son los que se sientan ahí, escuchan la prueba y después el Tribunal les da unas instrucciones de ley, les explica cuál es la ley que debe gobernar su deliberación, la ley aplicable al caso y ellos se retiran a deliberar y de esas doce personas nueve, por lo menos nueve, tendrían que concurrir, tendrían que estar de acuerdo en que usted es inocente o que es culpable antes que se pueda aceptar ese veredicto de inocencia o de culpabilidad. ¿Me está siguiendo?

R Sí, señor.

P Mientras que por tribunal de derecho, en lugar de ser el jurado, ese grupo, es el Juez el que decide si usted es inocente o culpable de los hechos que se le imputan. ¿Ve la diferencia ahora? Ahora, cuál es la decisión suya, por jurado o por tribunal de derecho?

R Tribunal de derecho.

P ¿Alguien le ha obligado a usted a renunciar a ese derecho de ser juzgado por jurado?

R No, señor.

P ¿Alguien le ha amenazado en alguna forma?

R No, señor.

P ¿Lo hace libre, voluntaria, espontáneamente?

R Sí, señor.

P ¿Estuvo usted en la escuela?

R Sí, señor.

P ¿Hasta qué grado?

R Octavo grado.

P ¿Y qué edad tiene?

R Veintinueve.

HON. JUEZ:

El Tribunal entiende que la renuncia es inteligente, consciente y los casos se verán por tribunal de derecho y se llamarán un poco más adelante." (T.E. págs. 4-8, Vista del 3 de abril de 1974.)

Pero más aún, en la vista señalada el 15 de mayo el apelante ratificó expresamente la renuncia al jurado que había hecho anteriormente. (Véase pág. 1, vista del 15 de mayo de 1974.)

Se dicta sentencia confirmando la aquí recurrida.

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Negrón García concurre en el resultado con opinión.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión concurrente del Juez Asociado, Señor Negrón García, con la cual está conforme el Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 17 de enero de 1977

Aun cuando concurro con el dictamen del Tribunal, sostengo el criterio de que los importantes planteamientos de inconstitucionalidad relativos al debido proceso y a la igual protección de las leyes formulados por primera vez por el apelante ante este foro debieron disponerse en sus méritos, máxime en vista de nuestra facultad judicial de tomar conocimiento de la data empírica y científica existente[1] sobre las características de la marihuana, la diferencia que la Asamblea Legislativa estableció en la Ley de Sustancias Con-

---

[1] La facultad judicial de tomar conocimiento de data empírica a los fines de examinar la validez de un estatuto quedó expuesta claramente en *Brown* v. *Board Education*, 347 U.S. 483, 494 (1954). Tenía como precedente un caso anterior resuelto desde comienzos del siglo: *Muller* v. *Oregón*, 208 U.S. 412 (1908). Es de suponer que tales estudios forman parte del trasfondo de la Legislatura al aprobar una ley y al mantenerla vigente.

troladas—Núm. 4 de 23 de junio de 1971 (24 L.P.R.A. sec. 2101 y ss.)—al no clasificarla como droga adictiva, y la trascendencia del asunto.

"Una ley puede echar raíces tanto en la ficción como en hechos. Ciertamente, una política pública concebida en la ignorancia puede ser continuamente reafirmada, aun con más vehemencia, mientras sus orígenes permanezcan obscuros o su falacia no sea expuesta. No obstante, una vez la chispa de la verdad enciende el proceso de opinión pública, la autoridad del momento no podrá detener las flamas de la controversia. En tiempos estables la política pública podrá dar prontamente marcha atrás o ser modificada para concordar con la realidad. Sin embargo, en tiempos volátiles, una sola controversia puede perder su vigencia. Abastecida por las flamas y generado por los asuntos públicos relacionados, el fuego puede propagarse; y la verdad ser consumida nuevamente en el choque explosivo de dos ideologías culturales en competencia.

Así ha sido con la marihuana. Suprimida por cuarenta años sin estar significativamente ante la opinión pública, la 'hierba asesina' de repente ha salido a la superficie como el eufórico preferido de millones de norteamericanos. Difícilmente transcurre un día sin que estemos expuestos a la propaganda de uno u otro lado. Apenas pasa un día sin que ocurran arrestos por violación a la ley de marihuana cuyas cifras no sean objeto de titulares. Ante las legislaturas y las cortes, la ley es atacada y defendida con igual fervor. Testimonios de sociólogos, médicos y policías referentes a los efectos de la droga son transmitidos febrilmente a un público en expectativa." Bonnie & Whitebread, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry Into the Legal History of American Marihuana Prohibition*, 56 Va. L. Rev., págs. 974–975 (1970).

Estoy convencido de que estas expresiones tienen validez contemporánea en el medio ambiente puertorriqueño. "En una encuesta reciente con una muestra representativa de la población, la mayoría respondió que el uso de la marihuana era el problema número uno de la comunidad y el más dañino para el individuo [escogiendo entre el alcohol, el fumar tabaco y la marihuana, Klapper, 1975]. Esta encuesta también

554

reveló que la mayoría de la población considera la marihuana una droga muy parecida a la heroína. En general, existe evidencia que demuestra que la sociedad puertorriqueña vincula el abuso en drogas al deterioro social en una relación causal y particularmente ve el abuso de drogas como 'causante de conducta criminal'." Pacheco Maldonado, A., *Culture and Addiction: Some Reflections from the Puerto Rican Perspective;* Ponencia ante Seminario Internacional sobre Factores Socio-culturales del Uso No Médico de Drogas (5 de noviembre de 1975), pág. 11.

En armonía con lo expresado, intentaré exponer la data empírica y científica que existe sobre el particular tomando conocimiento de las conclusiones generales y proposiciones específicas consignadas en los estudios gubernamentales y privados más reputados y la abundante literatura sobre la marihuana, de fácil acceso, [2] incluyendo algunas de las con-

---

[2] Como fuentes de referencia: *Marihuana and Health,* Fifth Annual Report to the U.S. Congress (1975); *Marihuana: A signal of Misunderstanding* (Vol. I y II, The Technical Papers of the First Report of the National Commission on Marihuana and Drug Abuse), U.S. Government Print. Off. (March 1972)—conocido como *Shafer Report*—; Brecher, E. M.; *Licit and Illicit Drugs:* Consumer Report: Marihuana and Hashish, págs. 395-472 (1972); *Interim Report of the Commission of Enquiry into the Non-Medical Use of Drugs,* Canada (1970)—denominado *Le Dain Report; Task Force Report: Narcotics, Marijuana & Dangerous Drugs;* Findings and Recomendations, Special Presidential Task Force (1969); *Task Force Report: Narcotics and Drug Abuse:* President's Commission on Law Enforcement and Administration of Justice (1967); Marihuana: *Report of the Indian Hemp Drugs Commission 1893-1894* (1969 Ed.). Este último se considera uno de los estudios investigativos más completos y objetivos, cuyo valor trasciende su época. No fue divulgado en los Estados Unidos hasta su reimpresión en el 1969. Además: *El Uso de Cannabis,* Informe Núm. 478 de la Organización Mundial de la Salud (OMS), Ginebra (1971); *Subcomisión de Toxicomanías y Narcótico* (CONATON), Informe Núm. 7, Argentina (1975) (Biblioteca del Dpto. de Servicios Contra la Adicción); Aparicio O., *Drogas y Toxicomanías* (1972); *Drugs of Vegetable Origin as Narcotics,* 50 A.L.R.3d 1164; L. Grinspoon, *Marihuana Reconsidered* (1971); Fort, J., *The Pleasure Seekers: The Drug Crisis, Youth and Society* (1969).

troversias principales que subsisten en las distintas áreas del saber. ([3])

A) *Historia y Botánica en General*—

Es una planta anual herbácea normalmente dioica, clasicamente considerada como perteneciente a la especie *Cannabis Sativa L.*, de la familia de las cannabináceas que con facilidad crece en estado silvestre y se cultiva en climas semitropicales o zonas templadas en distintos lugares del Asia, Europa y América. Su uso, con fines placenteros, médicos y religiosos se remonta a la era pre-cristiana y cobra auge en el presente siglo.

Las características botánicas específicas de la planta se pueden compendiar en la siguiente descripción:

"a) Tallo: es simple, derecho rígido y puede alcanzar hasta dos metros de alto (PERROT), cilíndrico, verde claro a pardo claro, surcado longitudinalmente pubescente-escamoso.

b) Hojas: presentan caracteres diferenciales según se consideren las que aparecen en casi toda la longitud del tallo (inferiores), o las que llamaremos superiores, es decir las de la cúspide del mismo. Las inferiores que representan la gran mayoría, son pecioladas, opuestas, de forma que recuerda la palma de la mano; son por lo tanto palmita sectas, con 5 a 7 segmentos alargados, lanceolados, de bordes dentados y se presentan abiertas en abanico en el extremo de sus largos pecíolos. Las superiores se hacen altanas o aisladas, y su morfología se modifica; son en general, sésiles (sin pecíolo) trisectas (tres segmentos solamente) o aún menos divididas, o simples, es decir carentes de segmentación. En cuanto al tamaño, los segmentos en las inferiores pueden alcanzar hasta 15 cm de largo y alrededor de 3 cm de ancho.

c) Flores: verdosas, nacen en la axila de las hojas. Son de sexo separados.

---

([3]) Para una excelente exposición, consúltese a Pacheco Maldonado, A., *Controversia en la Investigación Científica sobre los Efectos del Uso de la Marihuana;* Ponencia revisada dictada ante el Ateneo Puertorriqueño el 5 de marzo de 1975.

Se trata de una planta dioica, es decir que existen ejemplares machos, portadores de flores masculinas, y hembras con flores femeninas; nunca en un mismo pie se hallarán flores de los dos sexos.

Las flores masculinas se presentan en racimos; las femeninas apretadas en pequeños grupos, rodeadas de hojas. Cada flor masculina está formada por un cáliz de 5 sépalos que rodea a 5 estambres, en disposición opuesta. La flor femenina consta de una sola envoltura floral (cala alrededor del ovario); este último contiene un solo óvulo. Completan el aparato genital femenino dos estigmas finos y alargados.

d) Fruto: es un aquenio grisáceo rodeado del cáliz, que persiste. Es liso, contiene una sola semilla, carente de albumen. Observando un corte de la semilla, puede verse que contiene una plántula (embrión) arrollada en espiral. En la base del fruto, se observa la presencia de una bráctea oval y lanceolada, pubescente. El largo del fruto es de 4 a 5 mm." (CONATON), *op. cit.*, págs. 2–3.

B) *Preparaciones*—

Tanto en el pasado como al presente, se reconocen tres preparaciones básicas de la cannabis, cuyos nombres vernáculos en orden creciente de potencia, son:

"La marihuana es la forma más corriente y difundida de consumo de Cannabis. Se realiza mediante el fumado individual o en grupos de *cigarrillos* confeccionados con *hojas maduras e inflorescencias masculinas y femeninas* de cannabis. Cuando el consumo se opera a través de una infusión, se denomina 'bhang'.

El 'Ganja' se presenta como masas aplastadas o enrolladas en husos, de color pardo oscuro, de olor aromático característico, constituidas por hojas superiores pequeñas e inflorescencias de la planta femenina de cannabis. Es aproximadamente 3 veces más potente que el bhang y la marihuana se utiliza para fumar en pipa.

Finalmente el 'hashish' o 'charas' o 'chira' es la preparación más potente, siendo de 5 a 8 veces más activa que la marihuana y el 'bhang'. La preparación está constituida *por la resina pura* de las inflorescencias y hojas de la planta femenina y se fuma habitualmente en pipa.

. . . el hábito más difundido es el uso de la marihuana bajo la forma de cigarrillos, generalmente de confección casera que con-

tienen de 0,5 a 1 g de restos vegetales de cannabis (hojas, inflorescencias, etc.). Es frecuente observar la circulación clandestina de cigarrillos de marca, que han sido vaciados y vueltos a llenar con una mezcla de restos vegetales de cannabis y hebras de tabaco. Más recientemente se han detectado cigarrillos armados con tabaco embebido en un extracto de resina de marihuana." (CONATON), op. cit., pág. 6.

C) *Ingrediente Alucinatorio*—

La planta cannabis es químicamente muy compleja. La amplia difusión del uso del preparado del cigarrillo de la marihuana como sustancia toxocomanígena, se debe a los efectos alucinatorios causados por uno de sus ingredientes psicoactivos: el delta 1–3, 4 transtetrahidrocannabinol (THC).[4]

D) *Factores Socio-Culturales*—

Sobre este extremo, a mi juicio el *Informe OMS*, condensa adecuadamente la interacción de los factores socio-culturales que entran en juego en torno al uso de la cannabis.

A tal efecto:

"La ingestión de drogas, especialmente de cannabis, parece estar unida no sólo a ciertas creencias y esperanzas individuales y de grupo acerca de sus efectos, sino también a un sistema axiológico y conceptual más amplio relacionado con aspectos como el valor relativo de los bienes materiales y de las creencias y experiencias espirituales, culturales y tradicionales; la importancia respectiva de los derechos, prerrogativas y responsabilidades del individuo y de la sociedad; naturaleza de prácticas que se consideran buenas y malas, y el sentido y el valor de la vida misma.

En resumen, la epidemiología del uso de la cannabis supone la existencia de tres factores: a) las características personales del consumidor real o potencial; b) las presiones socioculturales

---

[4] Nuestro estudio confirma la observación sostenida por varios autores de que una de las mayores dificultades para evaluar correctamente los resultados y experimentos sobre el uso de la marihuana en el individuo estriba en la falta de medidas uniformes en la dosis suministrada; diferencias variables en los sujetos; variaciones en los trasfondos socio-económicos; distintas expectativas; y las circunstancias y escenario en que se consume. En los últimos años, se han realizado esfuerzos nacionales y mundiales para superar estas dificultades. *Shafer Report*, págs. 20–22.

que se ejercen sobre él, y c) las propiedades farmacológicas de diversas preparaciones de cannabis. La medida en que su uso satisfaga necesidades conscientes (expresas o tácitas) o inconscientes ayudará a determinar si ese comportamiento se mantendrá o no. El uso de cannabis tiende a 'vincular' al consumidor a ciertas personas, mientras que a menudo lo 'enajena' de otras."

### E) *Motivos para su Consumo—*

"Se citan ampliamente como motivos para comenzar a consumir cannabis las relaciones con otros consumidores, la curiosidad respecto a los efectos de la droga y el deseo de relajamiento, el alivio de diversas tensiones o la búsqueda de sensaciones placenteras. Según Becker (1953) la iniciación por otros usuarios reviste importancia esencial pues el novicio debe aprender a fumar eficazmente, a reconocer los efectos de la droga y a considerarlos agradables. Especialmente en la India, intervienen de modo importante en la iniciación los motivos médicos y religiosos (Chopra y Chopra, 1939). Muchas personas dicen que comenzaron a usar cannabis tratando de reemplazar con ella el alcohol, opio, cocaína u otras drogas (Chopra y Chopra, 1939; Ewens, 1904). Algunos individuos comprendidos en muestras de consumidores en la India y Africa del Norte citan como motivo las propiedades afrodisíacas atribuidas a la cannabis (Chopra y Chopra, 1939; Soueif, 1967).

Uno de los motivos mencionados con mayor frecuencia para continuar el uso moderado de cannabis es la sensación de bienestar, de relajamiento y de alivio de tensiones experimentadas. Se recurre a esta droga menos frecuentemente con el propósito de aumentar la satisfacción sexual y de intensificar el disfrute de la música y la comida. También se ha señalado que se ingiere para atenuar la sensación de hambre (Chopra y Chopra, 1957; Indian Hemp Drugs Commission, 1894). Se ha señalado también como motivo para su uso continuado la necesidad de aliviar el aburrimiento, la frustración y la depresión (McGlothlin y col., 1970).

También se han citado algunos casos de obreros que la emplean con el fin de aliviar la fatiga y aumentar su resistencia (véase la sección 4.2.1). En Europa y América del Norte algunos usuarios sostienen que la cannabis estimula las facultades creadoras (McGlothlin y col., 1970) (véase la sección 4.2.1). En la India continúa usándose cannabis como automedicación para

aliviar o prevenir diversos síntomas (Chopra y Chopra, 1957). Como ya se ha indicado, la cannabis ocupa desde hace tiempo un lugar importante en las prácticas religiosas, tanto en la celebración de diversas festividades como por el uso que de ella hacen algunos sacerdotes u otros personajes religiosos (Chopra y Chopra, 1939). En este último caso se usa como auxiliar de la meditación y para obtener estados místicos. Los mendicantes religiosos con frecuencia permanecen en un estado de embriaguez crónica a causa de la cannabis, que sus seguidores interpretan como trance religioso (Chopra y Chopra, 1939; Indian Hemp Drugs Commission, 1894). Se ha señalado el uso religioso de la cannabis entre ciertos grupos culturales del Africa central y austral (Chopra, 1969), Brasil (Batista, 1959; Cordeiro de Farias, 1955), Jamaica (Blum y col. 1969a) y México (Livet, 1920); este uso se limita generalmente a las ceremonias.

Algunas veces se ha mencionado el empleo de la cannabis en Africa para estimular el valor y el arrojo en el combate y en conquistas amorosas, y en alguna ocasión se indica que la han usado ciertos grupos de guerreros de la India (Chopra y Chopra, 1939; Indian Hemp Drugs Commission, 1894). En general, su uso con estos fines parece ser muy raro. Según Postel (1968), los soldados estadounidenses fuman cannabis en Viet-Nam como relajante, pero no en combate.

También se aducen razones sociales para el uso de la cannabis que, más que cualquier otra sustancia embriagante, se emplea en el mundo entero en círculos pequeños, de modo que el deseo de sentirse íntimamente unido a un grupo reducido es sin duda un factor importante lo mismo para comenzar el uso de la droga que para continuarlo. Acaso contribuyan a estrechar la unión dentro del grupo las precauciones necesarias para evitar sanciones legales (Beker, 1953; Goode, 1969)."

F) *Características Comunes de Consumidores—*

Entre los observadores se describen una serie de características comunes entre los consumidores de la cannabis en los distintos medios culturales. Se destaca la necesidad de diferenciar entre el consumo *moderado* y el *intenso*, ya que el primero ". . . parece estar, más que el abusivo, bajo la influencia de factores tales como las costumbres y actitudes lo-

cales, la posibilidad de obtener la droga y el precio de ésta y quizás sobre todo la asociación del individuo con un grupo de personas afines que [la] consumen. Sin embargo, los consumidores, aunque con múltiples excepciones, suelen poseer ciertas características, a pesar de diferencias de ambiente sociocultural y magnitud del consumo."

Las características comunes apreciadas son:

1—Iniciación y uso popular entre adolescentes y los adultos jóvenes en proporción mayor entre el sexo masculino.

2—El consumo habitual entre consumidores que pertenecen a ciertos grupos socio-culturales específicos, que salvo el auge prevaleciente en Europa y América del Norte, parece estar limitado a grupos socio-económicos inferiores.

3—Los individuos que experimentan disfrute con sus efectos generalmente prefieren un estilo de vida no estructurado y espontáneo, son propensos a aceptar riesgos y aprecian los estados de alteración de la conciencia por dichos medios u otros métodos.

4—En la mayoría de los casos se trata de un joven soltero que muestra cierta inestabilidad respecto a su residencia, su trabajo, sus estudios y los fines que persigue en la vida, ello contrapuesto con aquellos individuos que prefieren un modo de vida disciplinado, estructurado, racional y seguro.

5—El uso excesivo de la sustancia está vinculado a ciertas anomalías de la personalidad, y en mayor proporción figuran aquellos afectivamente inmaduros, que toleran mal la frustración o eluden sus responsabilidades. "En su comportamiento esos rasgos se manifiestan por una valoración excesiva del presente en relación con el porvenir, una tendencia a dejarse llevar de manera pasiva, la imposibilidad de adquirir conocimientos y habilidades que exija un esfuerzo prolongado y una tendencia a preferir el pensamiento regresivo y mágico en lugar de racional." *Informe OMS*, págs. 18–20.

G) *Estudios: Clasificación y Efectos—*

En el pasado prevalecían irracionalmente nociones erróneas de la marihuana y era asociada y caracterizada popularmente, como parte de la mitología musulmana, como la "droga asesina". En Puerto Rico, históricamente, debido a múltiples factores entre los cuales cabe mencionar el incremento en su uso y las relaciones políticas y económicas con los Estados Unidos, legislativamente se siguió el patrón federal incorporándose su prohibición a nuestros estatutos, aun cuando es motivo de duda si al así hacerlo existía una base científica total, clara e inequívoca sobre su alto o bajo potencial dañino. (⁵)

Mucho se ha escrito sobre los "males" y "bondades" de esta sustancia. El análisis riguroso de la materia me convence de que es necesario ulteriores estudios respecto a los efectos negativos que con el tiempo, a largo plazo, puedan surgir. Abunda literatura de todo tipo. Afortunadamente el material científico incrementa constantemente. Sin embargo, la tendencia que se manifiesta en muchos escritos es caer en extremos afirmando que la marihuana es totalmente inofensiva, incapaz de generar daño alguno y otras veces atribuirle consecuencias altamente adversas de toda circunstancia y género.

Los estudios realizados a los fines de determinar los efectos, prevalencia e incidencia en distintos lugares del uso de la cannabis—que en los últimos años ha tomado proporciones epidémicas, en particular ante la juventud de edad escolar superior y universitaria—han aumentado. Aun cuando la literatura es abrumadora y existe divergencias de criterios, inclusive lagunas, los principales y más reputados que hemos citado revelan como denominador común—con mayor o menor

---

(⁵) Una encuesta llevada a cabo en Puerto Rico para el Departamento de Servicios Contra la Adicción, demostró que la opinión pública puertorriqueña, en mayor proporción, favorece la terapia o tratamiento compulsorio frente al enfoque estricto penológico. Pacheco, Angel M., *Attitudes Toward Marihuana in Puerto Rico*, Ponencia ante la Convención Anual de la Asociación Americana de Psicólogos (Sept. 1976).

énfasis—ciertas observaciones o conclusiones generales y específicas que debemos exponer.

1—*Clasificación*—La conclusión universal es que la marihuana no es narcótico, y por ende una clasificación en tal sentido es errónea. El criterio científico prevaleciente se inclina a considerarla como un *débil alucinógeno*, aunque algunos estiman que su carácter es más bien de intoxicante.[6] "En pequeñas dosis, la marihuana de baja potencia puede actuar como un eufórico y sedante suave similar al alcohol."[7] La diferencia de criterios radica en los distintos efectos alucinógenos—tales como afectar la memoria, crear ansiedad, confusión y desorientación y episodios psíquicos temporales que excepcionalmente se atribuye algunas personas experimentan, por predisposición personal o en orden a consumir una dosis más potente.[8] De ordinario, estos efectos no ocurren con el consumo simple de cigarrillos de marihuana de baja dosis, y se manifiestan con mayor frecuencia en drogas alucinógenas tales como el peyote, la mescalina, el potente L.S.D. Sin embargo, cuando la cannabis se consume en la forma de ganja y hashish (charas o chira), en dosis de mayor potencia, los efectos se asemejan más a los de las drogas alucinógenas.

2—*Dependencia Física y Psíquica*—

La marihuana no es una droga adictiva en el sentido de crear dependencia física. No hay síndrome característico de abstinencia definido éste como aquel que surge cuando se interrumpe abruptamente su uso y se manifiesta por desórdenes físicos graves que de ordinario surgen al suprimirse otras sustancias consumidas tales como la heroína, la morfina, los barbitúricos y el alcohol. Algunos autores describen ciertos síntomas irritables tales como angustia leve o mode-

---

[6] *Le Dain Report*, pág. 430.

[7] *Task Force Report*, 1969, op. cit., pág. 9.

[8] *Task Force Report*, 1967, op. cit., pág. 12.

rada, depresión, debilidad, trastorno del sueño, sudoración, pérdida del apetito, ligeros temblores, vómitos y diarrea que apuntan hacia un posible síndrome de abstinencia psicosomático en consumidores crónicos.

La *tolerancia* se define como "el estado de adaptación caracterizado por disminución de la respuesta a la misma cantidad de una droga determinada." Esta definición de tolerancia es diferente a la concebida como *"tolerancia inicial"* cuya connotación describe la dosis de droga necesaria que debe recibir una persona en su primera exposición para producir unos grados de efectos deseados. [9] También se ha mencionado y relacionado con la marihuana, el fenómeno que algunos autores han llamado como *"tolerancia invertida"* (*reverse tolerance*) mediante la cual se describe la circunstancia de ciertos individuos para lograr los efectos deseados a través del uso en dosis menores con posterioridad a haberla usado en dosis mayores. Los estudios no han aclarado este fenómeno. [10]

Hasta recientemente se aceptaba ausencia de signos de *tolerancia* por el consumo de sustancia cannabis. Sin embargo, en el Quinto Informe se indica la existencia de tolerancia en el consumo crónico de la Cannabis sostenida por investigaciones la cual se resume del siguiente modo: "En el ser humano la tolerancia aparentemente es, al igual que en los animales, un efecto relacionado con la dosis." [11]

La dependencia psíquica ha sido descrita como "un estado en el que una droga produce un sentimiento de satisfacción y un impulso psíquico que lleva a tomarla de modo contínuo o periódico para experimentar placer o evitar un malestar." A muchos consumidores habituales se les atribuye esta dependencia, sin embargo, se acepta que la mayoría que la usa oca-

---

[9] *Informe OMS*, op. cit., págs. 34–35; *Shafer Report*, págs. 23–25; *Marihuana & Health*, pág. 6.

[10] *Shafer Report*, págs. 25–26. *Le Dain Report*, págs. 182–183.

[11] *Ibid.*, págs. 35–36; *Task Force Report* (1967), págs. 12 y 13.

sional o casualmente, sea a título de experiencia o para celebrar una o dos veces al año, no es apropiado adjudicarle dependencia psíquica. ([12])

Respecto a la frecuencia en su uso se señalan las siguientes posibilidades: que una vez pasada la adolescencia cese; que algunas personas continúan consumiéndola de manera intermitente o esporádica; y que una vez fijado el hábito es probable que continúe su consumo cotidiano durante muchos años y probablemente persista toda la vida.

3—*Efectos Físicos Agudos Inmediatos*—

Los efectos físicos agudos a corto plazo o inmediatos por el consumo de la marihuana no son sustanciales. No existe récord de muerte que se atribuya directamente a la misma; ([13]) la toxicidad por una sobredosis—aparte de los resultados psicológicos más adelante descritos—usualmente tiene como última consecuencia el dormir. Las modificaciones fisiológicas consistentemente observadas son: aumento en el ritmo de las pulsaciones; incremento o disminución arterial sanguínea; congestión conjuntival (enrojecimiento de las membranas alrededor de los ojos); y la expresión de hilaridad.

La mayoría de los estudios señalan que estos síntomas al igual que los mentales dependen de la dosis, las circunstancias en que se consume, lo que espera el consumidor y de su personalidad. ([14]) "En resumen, la marihuana conteniendo $\Delta$-$^9$THC es una droga activa farmacológica de efectos físicos mínimos en dosis pequeñas a moderadas usadas por el ser humano." ([15]) La obtención del efecto máximo de la marihuana conlleva cierta técnica distinta a la usada para fumar tabaco que implica práctica de inhalar y mantenerla en los pulmones. Los efectos psicológicos o subjetivos comienzan

---

([12])*Shafer Report*, págs. 25–26. *Le Dain Report*, págs. 182–183.

([13])*Quinto Informe*, pág. 8.

([14])*Ibid.*, pág. 23; *Le Dain Report*, págs. 430–431.

([15])*Shafer Report*, pág. 36.

muy rápidamente una vez el $\Delta$-$^9$THC es fumado, y los efectos inmediatos pueden ser percibidos en el transcurso de un minuto, y en su etapa posterior los efectos máximos se alcanzan al cabo de 20–30 minutos. [16]

4—*Efectos Subjetivos (Psicológicos) Agudos Inmediatos*—

Al igual que los efectos físicos, la influencia subjetiva psicofarmacológica de la marihuana depende de muchos factores variables. No obstante, se acepta que la mayoría de los usuarios, de todas las edades, derivan una experiencia placentera debido a sus cualidades intoxicantes y eufóricas y que de ordinario guarda semejanza al alcohol actuando como un relajante que reduce las inhibiciones y facilita las relaciones sociales. En síntesis, los efectos clásicos observados son: euforia, aumento en la percepción, alguna distorción del sentido del tiempo, incremento en el apetito y breve menoscabo de memoria.

El informe Le Dain puntualiza:

"La 'obtención de placer máximo' típico (cannabis high) envuelve varias fases. Los efectos iniciales de ordinario son estimulantes y, en algunos individuos pueden sacar tensiones y ansiedades que usualmente son reemplazados por un sentimiento de bienestar agradable. Estos efectos usualmente tienden a hacer al consumidor introspectivo y tranquilo. Ocurren frecuentemente cambios rápidos de humor (*mood*).

Una inmensa hilaridad puede ser seguida de un silencio contemplativo.

Entre los efectos psicológicos típicamente informados por los consumidores se incluyen: felicidad, un sentimiento realzado de comunicación y relación interpersonal, aumento en la sensibilidad hacia el humorismo, juego libre de la imaginación, asociaciones poco usuales cognocitivas y de idealización, un sentido de realidad extraordinaria, una tendencia a percatarse de aspectos en el ambiente sobre los cuales uno normalmente no está atento, un realce de imaginaciones visuales, la alteración del

---

[16] *OMS*, pág. 22; *Task Force Report* (1969), págs. 8–11.

sentido del tiempo en el cual los minutos pueden parecer horas, cambios en la percepción visual de la relación de espacio, enriquecimiento de las experiencias sensoriales (aumento de los aspectos subjetivos en la percepción del sonido y el gusto), aumento en la comprensión personal y en la compenetración religiosa, leve excitación y energía (o precisamente lo opuesto), aumento o disminución en la actividad del comportamiento, aumento o disminución en la conversación y fluidez verbal, reducción de las inhibiciones, y en dosis altas, una tendencia a perder el hilo o a divagar el pensamiento. A menudo son descritos sentimientos de mayor espontaneidad y creatividad, aun cuando es muy difícil establecer científicamente un aumento real en la creatividad. Si bien la mayoría de los expertos coinciden que la cannabis tiene muy poco efecto específico afrodisiaco (estimular el sexo) muchos consumidores informan que aumenta el placer del sexo y otras relaciones íntimas humanas bajo su influencia.

Experiencias menos placenteras pueden ocurrir en diferentes individuos o posiblemente en los mismos individuos en distintos momentos. Algunas de estas reacciones pueden incluir miedo y ansiedad, depresión, irritabilidad, náusea, dolor de cabeza, dolor de espalda, aturdimiento, embotamiento a prestar atención, confusión, letargo y sensación de pesadez, debilidad y somnolencia. Ha sido informado desorientación, decepción, suspicacia y paranoia, y casos de pánico, pérdida del control, y estados sicóticos agudos." Págs. 174–175.

Y finalmente, entre sus conclusiones, este Informe consigna:

"Aparentemente produce un ánimo introspectivo, más autoabsorbente que el alcohol. El aspecto social de su uso puede ser el disfrute de sus efectos en compañía de otros, cada uno sintiendo y conociendo, como vínculo común, que los otros también están experimentando una experiencia similar. Puede que haya menos interacción que aquella estimulada al beber socialmente, aun cuando a menudo estimula risas e hilaridad. Se ha informado que la cannabis intensifica diversas clases de percepciones sensoriales, particularmente la apreciación del color y la música. También estimula el apetito. No se cree, como se aduce a menudo, que sea un afrodisiaco, aun cuando se reclama que aumenta el placer en la experiencia sexual. Se ha sugerido que la cannabis, como el alcohol, saca a flote las características funda-

mentales de la personalidad. Intensifica o enfatiza aquello que existe antes que añadir algo diferente o producir un cambio fundamental en el carácter. Por lo tanto la predisposición sicológica y el ánimo imperante en el sujeto probablemente se reflejarán en la experiencia con la cannabis. 'Malos viajes' (esto es, reacciones sicológicas de pánico o más serias) de la cannabis son poco observadas, y bajo examen, generalmente se estiman casos extraordinarios, que envuelven un decorado especial de factores que predisponen, tales como una ansiedad fuerte o un sentimiento de culpa. Situaciones de 'sicosis de cannabis' como efecto a corto plazo, aparentemente son muy raras y más bien el reflejo de una personalidad difícil muy particular de los sujetos envueltos, o dosis a un nivel excepcional." Págs. 432–433.

*5—Efectos Inmediatos en las Funciones Cognoscitivas y Habilidades Psicomotoras—*

Una de las áreas de mayor preocupación y debate ha sido los efectos a corto plazo sobre las funciones cognocibles y las habilidades psicomotoras—tales como la memorización, la organización en el tiempo, la capacidad de aprendizaje y tiempo requerido para reaccionar a diversos estímulos—de importancia en el desempeño de una ocupación, la operación de maquinarias, el conducir vehículos de motor y otras actividades y tareas de consecuencia social y valor cotidiano en nuestra moderna sociedad.

Sobre el particular, en términos generales se observa que el uso de niveles moderados afecta la ejecución normal de una persona y que ". . . la cannabis afecta de modo significativo las funciones cognoscitivas, tanto más cuando la dosis es alta y la tarea más compleja", destacándose que se afectan en mayor grado los principiantes, a saber, las personas que nunca o en raras ocasiones han consumido marihuana. (17)

El Quinto Informe señala:

---

(17) *OMS*, págs. 23–26; *Marihuana and Health*, pág. 5; *Le Dain Report*, págs. 193–194.

"Intentos más sofisticados para medir varios aspectos en el desempeño psicológico y psicomotor han estado generalmente en consonancia con los informes subjetivos. Menoscabo de la memoria, distorsión del sentido del tiempo y disminución en la ejecución de varias tareas han sido confirmadas experimentalmente. De ordinario, mientras más compleja la tarea, mayor el grado de desorganización producido por una intoxicación aguda. Aquellas tareas relativamente simples con la cual la persona está familiarizada, son mínimamente afectadas. Mayor exigencia o que sea más novedosa la tarea y/o el aumentarse la dosis, reduce más su ejecución. En dosis pequeñas, la tendencia confirma las afirmaciones de sus usuarios de que pueden suprimir el estado de placer, cuando las circunstancias lo exigen. Aun cuando los consumidores han informado que aumenta el conocimiento y la sensibilidad audio-visual y de tacto, los experimentos e investigaciones no lo han confirmado." Pág. 5.

De igual modo, los estudios han concentrado el aspecto en torno a la influencia de la marihuana en el manejar un vehículo de motor. Al respecto, el aludido informe expresa:

"Debido al papel prominente que el automóvil juega en nuestra sociedad, se ha puesto énfasis en las posibles implicaciones de una intoxicación por marihuana en cuanto a la seguridad del tránsito. Los primeros informes fueron más optimistas sobre el particular que la evidencia más reciente. Originalmente se encontró que aquellos que consumieron alcohol a nivel de intoxicación legal incurrieron significativamente en más errores de manejar en situaciones simuladas de conducción que los que consumieron una 'dosis social' de marihuana. Mientras los sujetos intoxicados por marihuana expresaron que se afectaba su actuación manejando, estimaron que podían compensarla manejando más despacio y cautelosamente.

Toda la evidencia al presente, ya sea derivada de los exámenes de conducir, de condiciones de tráfico actuales o de estudios experimentales de los distintos componentes en la tarea de conducir, indica que el conducir bajo la influencia de la marihuana es arriesgado. El uso simultáneo en aumento del alcohol y la marihuana por los conductores plantea una amenaza que puede muy bien exceder a la de la sola sustancia. Mientras los parámetros de riesgo relacionados con el manejar bajo los solos efectos de la marihuana o en combinación con el alcohol no son

todavía conocidos, parece justificado el desalentar tal uso. Es deseable una determinación más exacta de la extensión del riesgo envuelto en los distintos niveles de intoxicación. Tales estudios son complicados por las diferencias individuales pero de ningún modo imposibles de ser implementados." *Ibid.*

6—*Efectos Físicos y Psicológicos Crónicos a Largo Plazo*—

Aun cuando en la última década se han llevado a cabo estudios más científicos controlados y documentados en torno a las consecuencias tardías físicas y psíquicas del uso crónico de la marihuana, subsisten varias incógnitas, y el cuadro total de su potencial nocivo es todavía impreciso. Hay informes inconsistentes y no definidos sobre aspectos tales como efectos hormonales, sistema de inmunidad o defensas del cuerpo, anomalías cromosómicas, trastornos respiratorios y daño cerebral.

En torno a sus efectos psicológicos, se indica que la reacción pánica de ansiedad es probablemente la más adversa. No existe evidencia de psicosis, ni del llamado "síndrome amotivacional" que describe la situación mediante la cual su uso impide el desempeño exitoso de una tarea. Cabe sin embargo señalar que continúan los estudios para evaluar la data sobre deterioro de la personalidad consecutivo a su uso prolongado y respecto a si desórdenes psiquíatricos preexistentes en el individuo, son precipitados o agravados por el uso de la marihuana en grandes dosis. La *dependencia psicológica* mencionada con anterioridad ha sido caracterizada como una secuela a largo plazo.

La siguiente expresión compendia adecuadamente este aspecto:

"*Por supuesto el nivel de la investigación actual tampoco permite llegar al punto de concluir que la mariguana es totalmente inofensiva.* Lo que si parece plantearse como una tendencia en los resultados de las investigaciones es la noción de que la marihuana tal y como otras substancias puede tener efectos diversos en distintas personas. De esto se desprende que hay

base para cuestionar los relatos alarmistas que pretenden continuar utilizando el miedo y la confusión para desalentar el uso de la mariguana. (Bryant, 1974.) De otro lado, también es necesario puntualizar la necesidad de más investigaciones científicas que trasciendan la preocupación de encontrar que la mariguana hace daño y que profundicen en las posibles situaciones en que puede ser perjudicial o de ayuda." Pacheco, *Controversias en la Investigación Científica sobre los Efectos del Uso de la Marihuana,* págs. 30–31. (Énfasis suplido.)

7—*Uso Medicinal y Terapéutico*—

Como indicara anteriormente en los breves apuntes históricos, el uso de la planta cannabis con fines medicinales se remonta a la época precristiana. Hasta recientemente, por diversas razones, no se concentró seriamente en el estudio científico de las propiedades medicinales de esta planta. La producción sintética del delta-$^9$THC en laboratorios ha sido determinante en esta labor investigativa. El *Quinto Informe* recoge los pasos de avance dados sobre el particular, consignando experimentos prometedores.

El potencial terapéutico, se ha dividido en dos áreas generales: Las no psicológicas y las que surgen al producirse un cambio sicológico en el individuo. Entre las primeras, se observan estudios en el tratamiento del glaucoma reduciendo la presión intraocular; el tratamiento de asmáticos como broncodilatador, como anticonvulsivo, y como retardador en el crecimiento de tumores; y entre las segundas, se consignan como sedativo-hipnótico, analgésico, antidepresivo y tranquilizante, preanestésico, anti-emético en pacientes de cáncer recibiendo quimioterapia, y como terapia en adictos a drogas y alcoholismo. Págs. 8–9; 117–127.

(H) *Teoría del Primer Paso hacia otras Drogas*— *(Stepping Stone Theory)*

La relación causal entre el uso inicial de la marihuana y el consumo posterior de narcóticos adictivos es una de las polémicas más intensas y a juicio nuestro un enigma por descifrar, ello no obstante haberse demostrado que la marihuana

no posee una acción farmacológica predisponente de modo específico al uso de otras drogas. El consenso se inclina a estimar que el paso de la marihuana a otras drogas está relacionado y condicionado por importantes factores socioculturales y personales. ([18])

El Informe del Task Force de 1967 concluye:

"La alegación de que la marihuana 'conduce al uso de drogas adictivas' necesita ser críticamente examinada. Existe evidencia de que la mayoría de usuarios de heroína que han venido a la atención de las autoridades públicas, de hecho, han tenido experiencia previa con la marihuana. Pero esto no significa que una conduzca a la otra en el sentido de que la marihuana tenga una cualidad intrínseca, que cree una obligación a la heroína. Hay muchos usuarios de la marihuana que no se graduan a la heroína y demasiados adictos de heroína sin experiencia previa de marihuana para sostener tal teoría. Más aún no existe base científica para dicha teoría. El texto básico de farmacología, Goodman and Gilman, *The Pharmacological Basis of Therapeutics* (MacMillan 1960) de manera explícita expresa que el hábito de la marihuana no lleva al uso de la heroína.

La hipótesis más razonable es que algunas personas que están predispuestas a usar marihuana también lo están al uso de la heroína. También puede ser el caso, que a través del uso de la marihuana la persona forma una asociación personal que más tarde le expone a la heroína." Págs. 13–14.

Y el Informe de 1969 expresa:

"No obstante, el progreso [hacia otras drogas más potentes] probablemente no sea consecuencia de las propiedades farmacológicas de la marihuana, sino de una serie de factores sociológicos y psicológicos presentes en una minoría de los consumidores." Pág. 13.

En nuestra Isla, se realizó un estudio por el Centro de Investigación Social de la Universidad de Puerto Rico, denominado "Alienación Socio-Cultural y la Adicción a Drogas"

---

([18]) *OMS*, pág. 13; *Quinto Informe*, págs. 18–19; *Sociological Aspects of Marijuana Use*, op. cit., págs. 428–436; *Shafer Report*, págs. 88–89; y *Le Dain Report*, pág. 130.

por encomienda del Departamento de Servicios Contra la Adicción. De la información disponible surge: ([19])

". . . se completaron historiales biográficos de 694 adictos a heroína. Estas personas comenzaron su experimentación o uso de drogas variando en edad antes de los 7 años hasta mayores de 35 años. La edad mediana del grupo fue de 15.3 años al momento de empezar su experiencia con drogas narcóticas. Es de suma importancia notar que el 77% del grupo comenzó a usar drogas antes de cumplir los 18 años de edad, o sea tenían 17 años o menos. Más interesante aún es que solamente el 5.8% tenían 21 años o más cuando tuvieron esa primera experiencia. Obviamente está demás recalcar que el envolvimiento con drogas es un fenómeno básicamente de la juventud tomando lugar esencialmente en la época de mayor riesgo en el desarrollo de una persona, o sea durante su adolescencia. Estas personas iniciaron su experiencia con narcóticos con una variedad de drogas. *Entre ellas la más frecuente fue la marihuana, droga inicial para el 51.3% del total de la muestra.* En segundo lugar estaba la heroína con la cual se iniciaron el 30.3%. Le daré tercer lugar en orden de frecuencia a la pega, o sea el cemento de avión, el thinner con un 11.8%. El restante 7% se distribuyeron entre anfetaminas, barbitúricos, cocaína, support, licor fuerte y otros. De estos datos se desprende que ninguna droga en particular es determinante en el proceso de adicción a drogas. Esto es así, repito, porque la adicción es un proceso sociológico el cual puede iniciarse y mantenerse con cualquier tipo de droga. Debemos también notar que la marihuana fue una droga inicial para más de la mitad de todas aquellas personas que hoy se definen como adictos para nuestro estudio. Es relevante a su vez analizar uno de los supuestos que comúnmente oímos, esto es, el pensar que la adicción a drogas, especialmente la adicción a heroína, la droga más fuerte, es la etapa final de un proceso de graduación progresiva en el consumo de drogas el cual comienza con la droga supuestamente menos adictiva: la marihuana."

Dicho expositor suscribe la teoría sostenida por otros estudios de los valores sociales y culturales predisponentes

---

([19]) Ponencia del Profesor Pedro Vales del Centro de Investigaciones Sociales U.P.R. ante el Ateneo Puertorriqueño el 5 de marzo de 1975, págs. 4–5, 7.

al expresar ". . . los efectos sociales y negativos que pueda tener el consumo de marihuana para unas personas cuya condición de déficit les puede predisponer o hacer más propensas a la adicción." Reitera su criterio de que:

". . . la marihuana puede tener unos efectos nocivos pero no precisamente en el sentido epidemiológico y contaminante con el cual ha sido asociado en múltiples ocasiones. Es nocivo en cuanto pueda ser un vehículo que facilite y acelere la movilidad entre dos órdenes sociales, uno convencional o más o menos defectos y otros alienado y marginado que se desenvuelve alrededor de una vivencia de euforias creadas y asociadas con el consumo de drogas."

El Professor Pacheco Maldonado[20] describe la data existente del siguiente modo:

"En un estudio realizado con los clientes en programas de tratamiento (generalmente usuarios de heroína) en Estados Unidos y Puerto Rico para los años 1971 y 1972 se encontró que el 68% de los puertorriqueños usó como primera substancia la mariguana (Simpson, Curtis y Butler, 1975). La muestra total de este estudio consistió de 12,297 clientes y alrededor de un 10% eran puertorriqueños en programas de tratamiento en y fuera de Puerto Rico. La edad en la que se usó por primera vez una substancia ilegal fluctuó entre los 14 a 20 años para el 75% de la muestra total y en menos de catorce años para un 12%. En otro estudio con adictos a heroína Pedro Vales (1975) encontró unos datos similares ya que el 51.3% de su muestra utilizó la mariguana como primera substancia. En el estudio de Vales la experimentación con drogas empezó inclusive antes de los 7 años llegando hasta los 35 años. El 77% de la muestra comenzó el uso de drogas antes de cumplir los 18 años. El 74.4% de la muestra comenzó a experimentar en su propio vecindario y el 89% dijo que comenzó el uso de drogas por voluntad propia sin que los obligaran otras personas. Encontramos pues que al menos para estos grupos la mariguana es generalmente la primera droga que usan y que este uso comienza principalmente en la juventud. Estos datos concuerdan con los del estudio de

[20] Pacheco Maldonado, A.: *Controversias en la Investigación Científica Sobre los Efectos del Uso de la Marihuana*, op. cit., págs. 16–17.

Carmen S. García (1974) que encuentra que el 71.62% del total de 74 adictos a heroína (adictos para el 1969 y 1970) comenzó usando la mariguana como primera substancia. Sin embargo, en este estudio no se obtuvo suficiente información para determinar si estos adictos usaron el tabaco y/o alcohol como primera substancia. Es necesario aclarar que esta información de por sí no constituye evidencia para concluir que el uso de la mariguana lleva el uso de otras drogas como la heroína."

### I—*El Consumo de la Marihuana y el Crimen*—

Independientemente de que el uso de la marihuana pueda por definición de ley constituir un delito, el criterio casi unánime prevaleciente es que no se ha demostrado que su consumo, por las propiedades de la sustancia, sea causa directa de otros tipos de conducta criminal. Más bien los estudios demuestran una correlación entre el uso de la marihuana y la delincuencia pero no la existencia de relaciones causales.[21]

Se aducen varios argumentos para establecer una relación de causalidad entre su uso y la delincuencia clasificables en las siguientes tres categorías:

"a) La pérdida del dominio de sí mismo durante la embriaguez por cannabis puede dar por resultado actos violentos u otras formas de comportamiento.

b) El letargo provocado por la cannabis puede conducir a la pérdida de un medio de subsistencia legítimo e impulsar por lo tanto al robo.

c) La cannabis puede conferir el ánimo necesario para cometer actos antisociales a personas predispuestas a la delincuencia." *OMS*, supra; págs. 32–33.

Creo que la incógnita, hasta ahora contestada en la negativa, se sintetiza en el pensamiento que a continuación reproducimos del Profesor de Derecho John Kaplan:

---

[21] *Task Force Report* (1969), pág. 14; *Informe OMS*, págs. 32–34; *Le Dain Report*, págs. 439–440; *Shafer Report*, págs. 425–434; *Sociological Aspects of Marijuana Use:* Vol. IV, Núm. 2: *Contemporary Drug Problems*, págs. 421–428.

"Nadie nunca ha negado que las personas que fuman mariguana pueden cometer agresiones y crímenes violentos o pueden enajenarse mentalmente tal como puede suceder con personas que fuman cigarrillos [de tabaco] o a tales fines por personas que no usan ninguna droga.

Y nadie puede negar que alguien, bajo la influencia de la marihuana, realmente puede cometer agresiones o crímenes violentos o experimentar un episodio sicótico. La pregunta es: Sea a largo o corto plazo, ¿el fumar marihuana hace a un individuo más o menos propenso a cometer un crimen violento o a perder su salud mental? En otras palabras, ¿está la marihuana relacionada de cualquier modo causal a cualesquiera de estos fenómenos?" *Report of the Indian Hemp Drugs Commission:* Introduction, pág. IX.

El criterio moderno es que el uso excesivo de la marihuana puede enfatizar o agravar las condiciones agresivas individuales preexistentes, pero no causarlas. "Dado a la tendencia aceptada de que la marihuana libera las inhibiciones, una posible hipótesis es que los efectos dependen del individuo y las circunstancias. Puede, aunque no inevitable ni necesariamente, conducir a conducta agresiva o criminal. La respuesta dependerá más del individuo que la droga. Esta hipótesis es consistente con la evidencia de que la marihuana no altera la estructura básica de la personalidad." [22]

Del Quinto Informe copio:

"El posible vínculo entre el uso de la cannabis y la conducta criminal o agresiva, a menudo discutida, fue objeto de examen y estudios experimentales. *Ambas revisiones concluyen que la evidencia demostrativa de que la marihuana causa crimen es virtualmente inexistente.*" Pág. 90. (Énfasis suplido.)

En nuestro medio ambiente, con buen juicio se aconseja cautela y el explorar otras áreas pertinentes desconocidas sobre la "relación causal *indirecta*" del uso de la marihuana con el crimen:

---

[22] *Task Force Report,* 1967, pág. 13.

"Sería prematuro e infundado concluir en este momento que el uso de la mariguana no conlleva en más de un modo, contacto con el mundo de la criminalidad, pero ciertamente en base a esta hipótesis no podemos atribuirle a la substancia unas propiedades que aumenten la probabilidad de actuar de forma delictiva y violentamente. Urge de todos modos obtener datos de las condiciones del mercado y la distribución de la substancia, los costos y cómo se consigue el dinero para comprarla y a partir de qué patrón de consumo pueden aumentar los riesgos de problemas mayores con la ley. Es muy posible que de esta evidencia se plantee con más claridad el conflicto entre las leyes que por un lado procuran controlar el uso de la substancia y por otro crean las condiciones para que el mercado negro y la actividad criminal expandan su radio de alcance." Pacheco, *op. cit.*, pág. 36.

Resumiendo, el criterio científico y médico mayoritario es que la marihuana:

1. Como sustancia farmacológica, no es una droga adictiva.

2. En pequeñas dosis y esporádicamente no produce tolerancia física ni síndrome de abstinencia; no causa deterioros físicos ni mentales como tampoco insanidad mental ni muerte; no causa conducta agresiva, violenta ni crímenes; no conduce inexorablemente hacia otras drogas; y no es un afrodisiaco.

3. Sus efectos físicos y subjetivos negativos, dependen básicamente de la persona, medio ambiente y demás circunstancias externas.

No obstante lo expuesto, la evidencia demuestra con mayor o menor documentación que:

1. La tendencia del adicto de heroína puertorriqueño en haber comenzado con la marihuana.

2. Su uso es con el propósito de alcanzar "placer máximo" psicológico a través de unas experiencias placenteras de relajamiento, cambio rápido de humor, hilaridad, vuelo de la imaginación, distorción del tiempo, aumento en el apetito y breve menoscabo de la memoria; su potencial nocivo radica

en que puede producir disturbios psicológicos, ocasionalmente severos entre un mínimo reducido de consumidores.

3. Se afectan en menor o mayor grado la ejecución normal de las funciones cognocitivas y habilidades psicomotoras.

4. La marihuana no causa crimen *per se;* en ciertos individuos, al igual que otras sustancias controladas, puede conllevar conducta agresiva o delictiva.

J) *Diferencia Básica Entre la Marihuana y Otras Sustancias—*

Los planteamientos del apelante exigen unos breves apuntes sobre la diferencia entre la marihuana y otras sustancias controladas concebidas en la ley bajo una misma clasificación.

1—*Opiatos, Heroína y Morfina—*

Está firmemente establecido entre los científicos, psiquiatras, farmacólogos y sociólogos que existen diferencias fundamentales entre los opiatos tales como la heroína y la morfina—sus equivalentes sintéticos—y la marihuana. El opio y sus derivados como narcóticos producen una clara indiferencia al dolor y suprimen las necesidades básicas que mueven a actuar a los seres humanos tales como el hambre, el placer sexual y la respuesta al coraje. Su uso continuo conlleva el desarrollo rápido de una tolerancia que obliga al consumidor a ir incrementando la dosis para lograr los efectos deseados, surgiendo física y sicológicamente una necesidad para evitar los síntomas graves del síndrome de abstención. La persona experimenta un cambio en su temperamento e inhabilidad para concentrar desarrollando una apatía en conjunción a una degeneración física debido a mala alimentación y negligencia de higiene personal. Distinto a la marihuana, una sobredosis causa la muerte. El síndrome de abstención es tan doloroso y aterrador que el usuario puede llegar a cometer crímenes, agresiones violentas. u otros actos delictivos con el objeto de lograr la droga u obtener el dinero con que comprarla. Véase: *Martínez Rodríguez* v. *Jefe de Penitenciaría*, 92 D.P.R. 629 (1965), págs. 649–650.

El *Task Force Report*, 1967, resume sobre el particular lo siguiente:

"Los efectos de cualquier droga dependen de un sinnúmero de variaciones, entre las cuales está el humor y la espectativa del usuario. Los efectos de una droga se experimentan mejor en términos de los resultados probables. Esta discusión es más bien selectiva que exhaustiva. Con estas salvedades se puede decir que la heroína es un deprimente, elimina las ansiedades y tensiones y reduce el sexo, el apetito, y otras necesidades primarias. Puede también causar somnolencia e inhabilidad para concentrar, apatía y disminuir la actividad física, y puede trastornar la ejecución mental y física. Su administración repetida y prolongada ciertamente conduce a una tolerancia y dependencia física.

Este proceso comienza desde la primera dosis y una sobredosis puede conducir a un paro respiratorio, coma y muerte. En dosis toleradas por personas, no obstante efectos secundarios surgen de la preocupación de la persona con las drogas incluyendo descuido personal y mal nutrición. En el adicto americano el ritual es inyectarse la droga con una aguja de manera intravenosa; infecciones y abscesos pueden ser causados por el uso de equipos no esterilizados. El efecto mayormente asociado con la heroína es la euforia, casi siempre reflejando el alivio que un individuo en particular deriva de una ansiedad crónica. Entre los síntomas de la abstención, que alcanza su intensidad máxima entre 24 a 48 horas, están el dolor muscular, los calambres y náuseas." Pág. 2.

### 2—*Cocaína*—

La cocaína, contrapuesta con las drogas antes indicadas, es un poderoso estimulante que no crea tolerancia ni dependencia física. Sin embargo, la abstención se caracteriza por una depresión profunda con una compulsión fuerte para continuar su uso.

Se ha establecido que su uso produce una excitación intensa y marcada, tanto física como mentalmente, y comúnmente una reducción de las inhibiciones normales. Su uso excesivo conduce a una psicosis paranoia que se desarrolla y manifiesta con conducta violenta y agresiva; puede causar

convulsiones y la muerte debido a fallo respiratorio. *Licit and Illicit Drugs,* op. cit., pág. 276.

3—*Barbitúricos, Anfetaminas, Alucinantes*—

Entre las sustancias que la ley clasifica y prohíbe, también se encuentran las drogas depresivas y estimulantes que incluyen barbitúricos (depresivos), las anfetaminas (estimulantes) y las alucinógenas. El LSD, el peyote, la mescalina, el yague y otras presentan características similares a las drogas adictivas que invariablemente conducen a dependencia física, tolerancia y al síndrome de abstención. Veamos:

a) *Barbitúricos*—

Los *barbitúricos* constituyen drogas sintéticas con acción depresiva sobre el sistema central nervioso. Su uso continuo produce tolerancia y su interrupción síndrome de abstinencia. Una intoxicación barbitúrica no indica el estupor asociado con los narcóticos, pero conlleva efectos claros dañinos: puede ocurrir delírium trémens, con ilusiones, alucinaciones y otros síntomas de psicosis y puede sobrevenir la muerte por un colapso cardiovascular.

"El individuo intoxicado refleja una pesadez general, dificultad en el pensamiento, lentitud en el hablar y en el comprender, memoria pobre, juicio descuidado, disminución en la atención, inestabilidad emocional y una exageración en sus características básicas de personalidad. Son comunes inestabilidad, pugnacidad y morosidad. Puede haber risa o llanto sin provocación alguna, desaliño en sus hábitos personales, hostilidad e ideas paranoicas y tendencias suicidas." [23]

b) *Anfetaminas*—

Las *anfetaminas* crean una hiperactividad de las funciones físicas y mentales disminuyendo la fatiga, creando euforia, aumentando la habilidad en concentrar, el habla y la actividad motora.

---

[23] Jaffe, *Drug Addiction and Drug Abuse in the Pharmacological Basis of Therapeutics,* págs. 289–290 (1970).

"Dosis excesivas por períodos largos producen nerviosismo, mareo, temblor, inestabilidad, insomnio, confusión, ilusiones y depresión psicológica. Ocurre pérdida del peso, disturbios cardiovasculares y gastrointestinales y otras manifestaciones físicas, y en grandes dosis (donde no existe tolerancia) ha habido casos fatales de envenenamiento con convulsiones, coma y hemorragia cerebral."[24]

c) *Alucinógenos*—

Están representadas por el LSD (Lysergic acid diethylamide), el peyote, la mescalina, el psilocibina y el N-dimetriltriptamina (OMT) y otras, clasificadas como alucinógenos, psicodélicos o psicomiméticas, las cuales varían en potencia, y producen en el individuo efectos intensos de índole perceptual y psicológico.

"Estas drogas alucinógenas, fantásticas, psicodélicas o psicóticas (psicodélicas, porque ponen de manifiesto la mente, y psicomiméticas, porque provocan síntomas de psicosis) tienen como característica común provocar marcadas alteraciones de la percepción, del sentimiento en sí, de las emociones y del juicio. Producen alteraciones visuales que originan distorsiones en el tiempo y en el espacio, ilusiones, y a veces, alucinaciones. La conexión de la personalidad está parcial o totalmente rota.

Al mismo tiempo se observan grandes remolinos en el campo de la emoción que van desde el éxtasis al horror. Sus efectos dependen del estado en que se encuentre su consumidor, por lo que puede llevarlos por el 'buen viaje' marcado por la euforia, la alegría y la intensificación de todas las sensaciones, como conducirle por el 'mal viaje' que termina con el miedo, la desorganización e ideas de persecución aterradoras." *Aparicio*, op. cit., págs. 347–348.

Su nocividad surge de la conducta en que incurren los individuos que la consumen, habiéndose informado accidentes fatales y suicidios.

Cabe destacar que bajo este grupo de sustancias controladas, por su carácter de débil alucinógeno y en considera-

---

[24] J. Fort, *The Pleasure Seekers*, op. cit., pág. 156.

ción a los criterios legales de alto potencial de abuso; carencia de uso medicinal aceptado; y ausencia de condiciones aceptables de seguridad para uso bajo supervisión médica expuestos en el Art. 202 de nuestra Ley de Sustancias Controladas (24 L.P.R.A. sec. 2202 (b) (1) ) se clasifica la marihuana.

K) *Alcohol—*

El planteamiento del apelante respecto a las bebidas alcohólicas nos exige una breve descripción al respecto.

Es un intoxicante que opera en el sistema nervioso central y que en distintos niveles de dosis y fases, puede deprimir o estimular, tranquilizar o agitar, liberar las inhibiciones o causar sueño. Estos efectos se asemejan a aquellos producidos por los barbitúricos. Está claramente establecido que su uso continuo y excesivo crea tolerancia y el dejar de ingerirlo precipita síndromes de abstención, y en algunos casos alucinaciones y delírium trémens, incluyendo la muerte. El abuso del alcohol puede causar graves perjuicios físicos tales como cirrosis del hígado, afectar los riñones e hipertiroidismo.

Su producción en nuestra sociedad está reglamentada y su uso permitido; la mayoría lo consume socialmente. Es un factor reconocido en accidentes de tránsito, fatales y no, y está relacionado indirectamente con la comisión de delitos violentos.[25] Para una interesante exposición sobre el alcoholismo en nuestro país, véase: Alvarado de Cordero, M.A.: *En torno al Problema del Alcoholismo en Puerto Rico*, 34 Rev. C. Abo. P.R., Núm. 4 (noviembre 1973), págs. 695–702.

## II

Con el trasfondo de hechos y conclusiones expuestas, procede el análisis de los dos planteamientos de inconstitucionalidad apuntados por el apelante.

---

[25] Brecher, *op. cit.*, págs. 260–264.

Primeramente, no habiéndose alegado ni demostrado, [26] como tampoco reconocido, que el poseer o fumar marihuana sea un derecho expreso o implícito de rango constitucional, [27] creo que en el caso de autos se impone—en armonía con los criterios de revisión judicial sobre la cláusula constitucional de la igual protección de las leyes expuestos en *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975)—el examen de la clasificación de la marihuana bajo el análisis tradicional que postula la norma de que una clasificación legislativa no será invalidada a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado.

En segundo lugar, es de rigor señalar que los casos de *McCabe, Hudson, Sinclair* y *Lorentzen* son distinguibles e inaplicables al de autos; todos ellos anularon leyes que clasificaban la marihuana como un narcótico. Los mismos, en sus hechos específicos, no resolvieron ni pusieron en tela de juicio la procedencia de penas por infracciones por la marihuana y otras sustancias controladas no narcóticas. *McCabe* decidió que una infracción por marihuana debió haber sido castigada precisamente bajo la Ley de Control y Abuso de Drogas del estado de Illinois que cubre los barbitúricos, las anfetaminas y el LSD; *Sinclair* siguió dicho enfoque con relación a la Ley de Michigan sobre drogas no narcóticas; en *Lorentzen* se impuso una pena mínima de 20 años por la venta de marihuana; y en *Sinclair* una pena de 9 1/2 años por la posesión de dos cigarrillos de marihuana. Consúltese: *United States* v. *Maiden*, 355 F.Supp. 743 (1973).

En tercer lugar, debe quedar aclarado el poder válido de

---

[26] El apelante reconoce la facultad del Estado para reglamentar y prohibir el uso de la marihuana. Su inclusión en la Ley de Sustancias Controladas ". . . es proteger la salud, la moral y la seguridad públicas y su promulgación obedece al deber del Estado de proteger los valores y de promover el bienestar general." *Pueblo* v. *Pellot Pérez*, 92 D.P.R. 812, 815 (1965).

[27] *State* v. *O'Bryan*, 531 P.2d 1193 (1975).

la legislatura para proscribir e imponer sanciones criminales por la posesión y transportación de la marihuana. Los estudios recientes que propugnan que la marihuana es inofensiva no son tan concluyentes y finales que rebasen la presunción de constitucionalidad que cobija a la ley; no podemos presumir que la legislatura actuó arbitraria o irrazonablemente al considerar la marihuana como una sustancia peligrosa. Véase: *State* v. *Renfro*, 542 P.2d 366 (1975).

No se puede trasladar automáticamente al medio ambiente puertorriqueño los resultados que en diferentes y distintos trasfondos culturales y sociales se ha llegado.

"A menudo resulta difícil comparar los estudios y derivar generalizaciones de los mismos debido a la diferencia en sustancia, potencia y forma de administración. Cuando se añade a estas variables, diferencias sicológicas y fisiológicas en el escenario de los sujetos, su trasfondo socio-económico, expectativa en la experiencia, y las circunstancias o medio ambiente en que la droga es consumida, las cuales son de importancia para sus efectos, no es de asombrarse que exista en este campo tanta confusión y conflictos de opinión." *Le Dain Report*, págs. 424–425.

Las investigaciones científicas recientes no son suficientes para destruir la presunción de constitucionalidad que acompaña la legislación que proscribe la posesión y transportación de esta sustancia. Si bien la marihuana, en dosis bajas y consumo moderado, no causa los efectos dañinos que se le atribuyen, no se puede concluir que tal uso sea totalmente inocuo. Subsisten enigmas no explicados científicamente que cobijan la racionalidad de la legislación vedando la misma en el medio ambiente puertorriqueño. Los estudios que indican que la mayoría de adictos en heroína se iniciaron fumando marihuana, es un hecho de gran preocupación que amerita una serena reflexión y ulterior consideración.

El argumento expuesto que compara la marihuana con el trato que la ley brinda al alcohol, sustancia también dañina, y del cual se infiere la inconstitucionalidad, no es convincente.

Aun suponiendo que ambas sustancias fueran idénticas en cuanto a efectos perjudiciales—que no son—a nivel constitucional no es sostenible la premisa que tal argumento presupone, a saber, que la existencia de un mal es fuente jurídica para convalidar y legitimizar otro. *United States* v. *Kiffer*, 477 F.2d 349 (1973); *Louisiana Affiliate of Nat. Organization for Reform of Marihuana Law (NORML)* v. *Guste*, 380 F.Supp. 404 (1974).

Es doctrina jurídica establecida de que una legislación no viola la cláusula de igual protección, simplemente por cubrir ciertos perjuicios y desatender otros. Los problemas económicos y sociales de un Estado son de naturaleza práctica y la norma constitucional no conlleva que se erradiquen todos los perjuicios del mismo género a un mismo tiempo y en la misma forma. Véase *Railway Express Agency, Inc.* v. *New York*, 336 U.S. 106, 110 (1949). Como se dijo en *Jefferson* v. *Hackney*, 406 U.S. 535, 546 (1972):

"Recientemente esta corte enfatizó, en *Dandridge* v. *Williams*, 397 U.S. 471, 485 (1970), que en 'el área de la economía y del bienestar social, un Estado no viola la Cláusula de Igual Protección meramente porque las clasificaciones contenidas en sus leyes sean imperfectas'. Una legislatura puede afrontar un problema 'de paso a paso' o aun 'seleccionar una fase de determinado campo aplicándole un remedio, descuidando otros'."

Además, aparte de que existen diferencias claras en el uso y propósito de consumo entre ambas sustancias, el siguiente argumento es de gran fuerza persuasiva:

"Algunos consumidores de la marihuana han tratado de justificar su conducta alegando de que no es peor que el ingerir alcohol. Se estima que el consumo del alcohol es un gran problema para 5 ó 6 millones de americanos a los cuales no les es posible el controlar su bebida. En muchos casos, el ingerir excesivamente bebidas alcohólicas causa a estas personas y sus familias serios problemas físicos, psicológicos, sociales y vocacionales. Es un hecho bien conocido en los Estados Unidos que la mitad

de los accidentes fatales de tránsito están relacionados con el beber excesivamente.

Aun cuando el alcohol constituye un gran problema social, ciertamente no es válido el justificar que se adopte un nuevo abuso a base de que no es peor que el existente. El único resultado sería el aumento del daño social desde una nueva fuente. Ello no resolvería nuestros problemas sobre el alcohol y sólo conduciría a incrementar el número de individuos intoxicados por la marihuana. *Por otra parte, contrario al alcohol, la marihuana casi siempre es consumida por sus usuarios con el propósito expreso de obtener placer máximo (high), una intoxicación desorientadora." Task Force Report* (1969), págs. 13–14. (Énfasis suplido.)

Y en *State* v. *Renfro*, supra, se expone:

"Los apelantes también argumentan que la sección 1247 [posesión de más de 2.2 libras de marihuana] viola la igual protección, en que criminaliza la posesión de marihuana mientras que la posesión del alcohol continúa sin ser un crimen. Argumentan, que los peligros sustanciales establecidos del alcohol sobrepasan los daños menores no establecidos de la marihuana. No obstante, . . . no encontramos que los diferentes tratos legislativos entre el alcohol y la marihuana sea tan arbitrario e irracional como para violar la igual protección. Tal vez la legislatura ha optado por eximir de la prohibición el alcohol, porque ha determinado, a la luz del desastroso 'experimento noble' de la prohibición, que es casi imposible proteger a la sociedad del alcohol. El hecho de que la legislatura se considere a sí misma incapaz de prohibir a la sociedad de un perjuicio (alcohol) no conlleva la conclusión de que es irracional y arbitrario de la legislatura su intento de proteger contra otra sustancia (marihuana) que la legislatura racionalmente considera nociva. Aun cuando algunos miembros de esta corte puedan cuestionar la sabiduría de esta 'nueva prohibición' contra la marihuana, 'la doctrina . . . que el debido proceso autoriza a los tribunales estimar inconstitucional las leyes cuando creen que la legislatura ha actuado imprudentemente ha sido hace tiempo descartada'." Págs. 369–370.

En consideración a lo expuesto y en vista del nivel de conocimiento existente, en las circunstancias del caso, soy del criterio de que el primer error no fue cometido. El cata-

logar la marihuana bajo la Clasificación I(c) de la Ley de Sustancias Controladas, ni por definición ni descripción resulta irracional ni irrazonable; por el contrario constituye al presente un ejercicio constitucional válido y legítimo del Estado.

El segundo error imputa la nulidad de sentencia por constituir la misma un castigo cruel e inusitado. Ello conlleva el examinar la clasificación por las penas en vista de que el diseño legislativo impone unos castigos idénticos e iguales al violarse sus disposiciones por la simple posesión, independientemente de la sustancia que sea.

La prohibición constitucional de "castigo cruel e inusitado" contenida en la Sec. 12 de nuestra Carta de Derechos (Art. II, Sec. 12)—al igual que otros principios jurídicos constitucionales—consagra un concepto dinámico cuya naturaleza supera el enfoque restrictivo histórico que motivó su génesis en el sentido de proscribir únicamente castigos bárbaros e inhumanos tales como la quema en la hoguera, la decapitación, el desmembramiento del cuerpo y otras formas de tortura que constan tristemente en los anales de la historia. Especialmente responde a un proceso de depuración en el desarrollo humanitario del derecho penal en un país civilizado que proclama como tesis "la proporcionalidad con el delito cometido." 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, pág. 2572, (Ed. Equity 1961).

En *Pueblo* v. *Pérez Méndez*, 83 D.P.R. 228, 233 (1961), nos hicimos eco de la evolución moderna de esta prohibición constitucional, y reconocimos entre los factores que nutren dicha conceptualización que ". . . el castigo determinado por el poder legislativo debe estar en proporción con el problema social que tiende a evitar." Establecimos además la norma general—fundada en la separación de poderes constitucionales y el respeto y deferencia hacia el poder legislativo—que de ordinario los tribunales no alterarán los términos de una sentencia que esté dentro de los límites fijados en una ley,

pues nuestra misión básica será cumplida examinando si la misma, *per se*, constituye o no un castigo excesivo; norma reiterada en *Pueblo* v. *Pedrosa Muriel*, 98 D.P.R. 34, 39 (1969).

Recientemente el Tribunal Supremo de los Estados Unidos, al decidir el caso de *Gregg* v. *Georgia*, 49 L.Ed.2d 859, 872–878 (1976), y sostener la constitucionalidad de la pena capital, en opinión suscrita por el Juez Asociado Sr. Steward, recoge el concepto dinámico expuesto enfatizando que la cláusula exige una evaluación de los valores contemporáneos referentes a la aplicación de determinada sanción, formulada en orden a los indicios objetivos reflejados en la actitud pública; el castigo debe estar acorde con la premisa de la dignidad del ser humano evitando la degradación del convicto. El criterio para detectar si una pena es o no excesiva toma en cuenta dos aspectos, a saber, que no conlleve la inflicción de un castigo innecesario y, que claramente no guarde desproporción con la gravedad y severidad del crimen.

Fundamentado en las funciones propias del Poder Judicial en contraposición a las del Poder Legislativo como representante legítimo elegido democráticamente por un pueblo, los tribunales no estamos autorizados a usurpar las funciones de los legisladores exigiendo la imposición de la pena menos severa; en consecuencia se presume válida aquella seleccionada por los legisladores, correspondiendo al que la impugna demostrar satisfactoriamente su ilegalidad. Véanse las siguientes anotaciones: *Narcotics Sale—Sentence as Excessive*, 55 A.L.R.3d 812–895; *Cruel Punishment—Length of Sentence*, 33 A.L.R.3d 335–386.

No obstante, ello no debe significar una renuncia a nuestra función judicial. En casos apropiados, venimos obligados a examinar la razonabilidad de las actuaciones y clasificaciones legislativas, y en tales situaciones resulta inaplicable la doctrina de "defensa judicial". El descargo de esta función a veces conlleva la labor de determinar ciertos hechos

ya que no podemos cerrar los ojos ante errores claros cuando su validez descansa en la verdad de lo declarado.

El reconocimiento en nuestra Ley de Sustancias Controladas de que la marihuana no es una droga adictiva presupone el reconocimiento de un hecho científico—al presente aceptado; sin embargo *la clasificación de delito grave* por su simple posesión, con penas de uno a cinco años, puede resultar una anomalía y contradicción. La identidad de la pena por meramente poseer marihuana con otras drogas más potentes aparentemente ignora las diferencias de peligro y efectos entre ambas y el hecho científico de que la primera no es una droga narcótica.

Sin embargo, reconozco que en las circunstancias particulares del caso de autos, no es necesario pasar juicio sobre la constitucionalidad de las penas y resolver su racionalidad y lógica, a la luz de lo apuntado, pues todas las sentencias fueron impuestas a cumplirse concurrentemente, y el apelante no incurrió en una mera posesión, sino que, aun en pequeña escala, la distribuyó con fines de lucro. Basta señalar que en la legislación vigente subsiste un tratamiento punitivo por la simple posesión de marihuana análogo al de las drogas narcóticas más potentes, criterio que no sigue la legislación federal que penaliza dicha simple posesión con un máximo de un año y la mayoría de las jurisdicciones estatales que la clasifican, como regla general, delito menos grave, salvo la caracterización de grave por la posesión de determinadas cantidades. Es motivo de preocupación que en adición a la jurisdicción de Puerto Rico, únicamente dos estados de la Unión —Pennsylvania y Mississippi—clasifican la simple posesión como delito grave independientemente de la cantidad envuelta. Otros Estados, Oregón y Alaska han discriminalizado la mera posesión de una onza o menos de marihuana al prescribir penas de multa de naturaleza civil hasta $100.00.

Hago reserva expresa sobre el particular, aprobando el siguiente lenguaje:

"Aparte de los aspectos científicos, no estamos desatentos del impacto que la clasificación continua de la marihuana como droga tiene en la ciudadanía, agentes y recursos del Estado. Un delito grave es un crimen muy serio; su convicción puede acarrear la pérdida de la libertad y los derechos disfrutados por otros ciudadanos. La integridad—y la obediencia—de las leyes de este Estado, más aun, en último análisis, descansa en el consentimiento del pueblo. No pueden consentir en aquello que no consideran cierto, ni pueden creer aquello que ha sido desaprobado en los laboratorios científicos del país. . . ." *People* v. *Summit*, 517 P.2d 850, 854 (1974).

## III

Respecto al tercer error apuntado es menester aclarar que el caso de *United States* v. *Collier* citado por el apelante —en unión a otros dos no mencionados, a saber, *United States* v. *Lewallen*, 385 F.Supp. 1140 (1974) y *United States* v. *Walton*, 514 F.2d 201 (1976)—constituyen un criterio judicial minoritario, que aunque respetable, es de escaso valor persuasivo y de dudoso alcance de precedente aun en las jurisdicciones en que fueron resueltos. Al efecto en *United States* v. *Kelly*, 527 F.2d 961, 963 (1976) se dice:

". . . la posición de Kelly encuentra poco apoyo salvo *United States* v. *Lewallen*, 385 F.Supp. 1140 (W.D. Wis. 1974). Allí, la corte de distrito declaró con lugar una moción para un fallo absolutorio. [Después de desfilada toda la prueba y quedar sometido el caso ante Tribunal de Derecho.] Ello impidió al gobierno de entablar una apelación. Tiene un significado particular el hecho de que el Juez en *Lewallen* descansó principalmente en *United States* v. *Collier* (19 de marzo de 1974), un caso no publicado del Tribunal Superior del Distrito de Columbia. Que *Collier* era un bejuco fino para hilvanar una decisión se hizo claro el 5 de marzo de 1975, cuando la Corte de Apelaciones del Distrito de Columbia, *sub silencio* revocó dicha decisión al revocar cuatro casos más en que los jueces de instancia habían desestimado las acusaciones bajo la misma teoría. Véase *United States* v. *Johnson*, D.C. App. 333 A.2d 393 (5 de marzo de 1975). . . ."

Ello contrasta notablemente con las numerosas decisiones que recogen el sector mayoritario judicial respecto a la definición de la sustancia marihuana como *cannabis sativa L.* y su consecuencia jurídica en el procesamiento de causas criminales. En síntesis, las decisiones al respecto, por diferentes análisis y fundamentos, han concluido que el Congreso, en la definición de marihuana utilizada en la Ley Federal de Sustancias Controladas de 1970 y su predecesora, incluyó toda especie (28) de marihuana irrespectivamente de la controversia surgida hace unos pocos años, y que todavía prevalece en el mundo científico, respecto a si la especie botánica *cannabis*—de donde se extrae el ingrediente responsable de los efectos alucinógenos (THC)—es de carácter monotípico, o sea de una sola especie de la familia de las canabináceas, o de índole politípica, esto es, de más de una. A nivel de los circuitos federales, véanse: *United States* v. *Kelly, supra; State* v. *Horneus,* 508 F.2d 566 (1975), cert. denegado, 421 U.S. 948; *United States* v. *Walton,* 514 F.2d 201, 203 (1975); *United States* v. *Spann,* 515 F.2d 579 (1975); *United States* v. *Ludwig,* 508 F.2d 140 (1974); *United States* v. *Gaines,* 489 F.2d 690 (1974); *United States* v. *Sifuentes,* 504 F.2d 845 (1974); *United States* v. *Kincy,* 505 F.2d 1354 (1974); *United States* v. *Rothberg,* 480 F.2d 534 (1973), cert. denegado, 414 U.S. 856; *United States* v. *Moore,* 446 F.2d 448 (1971), cert. denegado, 406 U.S. 909. Y en aquellas jurisdicciones estatales en que se adoptó una definición de marihuana análoga o parecida a la contenida en la Ley Federal, consúltese: *State* v. *Simpson,* 534 S.W. 568 (1976); *Win-*

---

(28) Para un mejor entendimiento de lo más adelante expuesto merece tenerse presente las siguientes definiciones: Especie-Cada uno de los grupos en que se dividen los géneros y que se componen de individuos que, además de los caracteres genéricos, tienen en común otros caracteres por los cuales se asemejan entre sí y se distinguen de las demás especies. La especie se subdivide a veces en variedades o razas; Género-Conjunto de especies que tienen cierto número de caracteres comunes. *Diccionario de la Lengua Española,* Decimonovena Ed. (1970), págs. 570 y 661 respectivamente.

*ter* v. *State*, 545 P.2d 786 (1976) ; *Goodner* v. *State*, 546 P.2d 653 (1976) ; *McKenzie* v. *State*, 326 So.2d 135 (1976) ; *Nelson* v. *State*, 319 So.2d 154 (1975) ; *People* v. *Rodríguez*, 238 N.W.2d 385 (1975) ; *People* v. *Riddle*, 237 N.W.2d 491 (1975) ; *State* v. *Murphy*, 234 S.W.2d 54 (1975) ; *Hicks* v. *State*, 534 S.W.2d 872 (1975) ; *Haynes* v. *State*, 312 So.2d 406 (1975) ; *People* v. *Van Alstyne*, 121 Cal. Rptr. 363 (1975) ; *People* v. *Holcomb*, 532 P.2d 45 (1975) ; *Cassady* v. *Wheeler*, 224 N.W.2d 649 (1974).

El examen de los casos citados y la literatura disponible permite concluir que hay varios científicos que en orden a estudios recientes sostienen que existen por lo menos tres especies de marihuana, *Cannabis Sativa, Cannabis Indica,* y *Cannabis Ruderalis.* [29] La divergencia de criterios emana

---

[29] De la revista Economic Botany, Vol. 27, No. 1 (Enero–Marzo 1973) y bajo el título *Mississippi-Grown Marihuana—Cannabis sativa Cultivation and Observed Morphological Variations,* se deduce la posibilidad de más variedades:

"Marihuana y Cáñamo son solo dos de los muchos nombres vernáculos de la planta 'Cannabis'. Debido al gran número de nombres aquí no los enumeramos. Alguna de las referencias incluidas sirven como fuente de tales nombres.

"A través de un período de más de 200 años, a los especímenes considerados distintos de *Cannabis sativa* se le ha asignado un número considerable de nombres científicos. Carolus Linnaeus (Carl von Linne) aplicó este binomio a las especies de plantas y su descripción original aparece en *Species Plantarum* (p. 1027) en 1753. *Desde dicha época algunos estudiosos en el campo de la botánica y la horticultura han aplicado otros nombres a la variante que consideramos están dentro del ámbito de la sativa Linnaeus.* Algunos ejemplos son:

"C. indica Lam. Encye. 1: 695. 1783.

"C. macrosperma Stokes Bot. Mat. Med. 4: 539.1812.

"C. generalis E.H.L. Draus in Sturm, Fl. Deutschland ed. 2, 4: 199.1905.

"C. gigantea Crevost in Bull. Econ. Incochine, n.s. 19.613. 1917.

"C. ruderalis Janisch. in Acta Hort. Petrop. 53.84. 1930.

"C. gigantea Hort.

"C. gigantea Delile. L. Vilmorin Rev. Hort. 5 is 3, 109.1951.

"C. sativa L. var. pedemortana A. Dc., Prodromus, 16(1). 31. 1869."

Págs. 117–118—(Énfasis suplido.) (Biblioteca de Ciencias Naturales U.P.R.)

Taxonomía se define *como la ciencia* "que trata de los principios de la clasificación; aplicación de estos principios a las ciencias particulares, en

más bien de dos escuelas de pensamientos distintas: la bioló-
gica y la morfológica. *United States* v. *Rothberg*, supra, págs.
1116–1117. [*sic*]

*Haynes* v. *State*, supra, orienta sobre el problema:

"El término marihuana no es nombre científico; es una ex-
presión familiar. No obstante, las leyes definen marihuana de
dos modos, botánica y químicamente. La clasificación taxonómica
botánica describe una planta por su género y nombre de especie.
Usando su género o nombre de especie, muchas leyes definen
marihuana como Cannabis Sativa L. Cannabis es el nombre del
género; sativa el nombre de la especie; y la L. está por Linnaeus,
quien descubrió y describió la marihuana." Pág. 410.

Lo expuesto, puede condensarse del siguiente modo:

a) En algunos círculos científicos existen serias discre-
pancias en cuanto a si la planta *Cannabis Sativa* es monotí-
pica o politípica; pugna surgida recientemente a la luz de
experimentos realizados en condiciones óptimas de control
con plantas completas y que ha tenido repercusiones en los
tribunales. Al parecer, el consenso mayoritario en la comuni-
dad científica de taxonomistas norteamericanos se inclina al
presente a favorecer la teoría politípica.

---

especial la botánica y la zoología." *Diccionario de la Lengua Española,*
op. cit., pág. 1247.

Las clasificaciones entre una teoría y otra se reflejan del siguiente
modo:

### Monotípica

| | |
|---|---|
| División: | Spermatófita (plantas con semilla) |
| Clase: | Angiospermae (plantas con floración) |
| Subclase: | Dicotiledóneas; 31.874 especies |
| Orden: | Urticales (olmos, moras, ortigas y cáñamos); 1.753 especies |
| Familia: | Cannabináceas (lúpulos y marihuana); 3 especies |
| Género: | Cannabis |
| Especie: | Sativa |

### Politípica

| | |
|---|---|
| Clase: | Angiospermae (plantas con florum) |
| Subclase: | Dicotiledóneas |
| Orden: | Urticales |
| Familia: | Cannabináceas (lúpulo y especie—cannabis) |
| Género: | Cannabis |

b) En la actualidad, una vez la planta es cortada, no existe un método para distinguir *Cannabis Sativa* de las otras alegadas especies de marihuana. Véase *People* v. *Riddle*, supra, pág. 492. En *Leary* v. *United States*, 395 U.S. 6, 50 (1969), el Tribunal Supremo de los Estados Unidos observó: "En cuanto apariencia, parece ser que existe una sola especie de marihuana, y de que aun los expertos no pueden decir a ojo donde se cultivó un ejemplar en particular."

c) Sea monotípica o politípica, todas las tres alegadas especies descubiertas, cannabis *sativa*, cannabis *índica* y la cannabis *ruderalis*, contienen el elemento químico (THC). *Cassady* v. *Wheeler*, supra, pág. 651. ([30])

No es necesario el endoso a la teoría ortodoxa o la de nuevo cuño. Como correctamente señala la Sentencia del Tribunal, la prueba de los peritos del Estado estableció fuera de duda razonable que la sustancia ocupádale al apelante era marihuana. Ambos, a preguntas de la defensa suscribieron la teoría monotípica al indicar que el término "cannabis sativa L." se aplica a toda variedad de la marihuana, y que la diferencia entre la *sativa*, *índica* y *americana* era de nombre, resultado del lugar de origen.

Independientemente del desenlace final que en definitiva pueda desarrollarse en el campo científico respecto a ambas teorías, soy del criterio de que la definición legal de marihuana adoptada por la Legislatura abarca todo tipo, y no únicamente la *cannabis sativa L.*

La ley que rige el caso de autos conocida como Ley de Sustancias Controladas, al igual que la derogada, ([31]) salvo ciertas modificaciones, fue adoptada siguiendo una propuesta sobre legislación uniforme federal. El historial legislativo disponible informa:

---

([30]) Véase no obstante: *The identification and misidentification of marihuana*, 3 Contemporary Drug Problems, págs. 291–344.

([31]) *Pueblo* v. *Pellot Pérez*, supra, 816 y 817.

"Este proyecto está concebido en una forma integral. Se ha tomado como modelo la Ley Federal de Sustancias Controladas, de 27 de octubre de 1970, (Public Law 91–513). Al ajustar dicha ley a nuestro sistema jurídico y administrativo, se han formulado los cambios pertinentes." *Informe Comisiones de Salud y Bienestar y de lo Judicial de la Cámara* suscrito en 17 de mayo de 1971, pág. 14.

La definición de marihuana en la nueva ley sigue *ad verbatim* la de la Ley Federal vigente, y como podrá notarse, amplía el de la derogada.

No existe constancia de que al aprobarse la ley actual o la anterior, la Legislatura estuviera o no consciente de la existencia en el campo científico de otras posibles especies adicionales de marihuana. Al contrario, el récord en dicho foro revela el firme propósito de modernizar y atemperar las leyes prevalecientes al plan de legislación uniforme de los Estados Unidos.

Para dicha época el punto de vista científico mayoritario era que la planta *Cannabis* era monotípica.[32] El que posteriormente surgieran unos criterios distintos con referencia a la nomenclatura y clasificación apropiada no puede alterar el significado legal; el elemento determinante es la intención y trasfondo legislativo y no los subsiguientes cambios de criterios en los científicos.

Coincido con el enfoque mayoritario judicial de los tribunales de Estados Unidos, de que la definición de marihuana en nuestra Ley no fue calcada de la federal con el propósito de que sirviera como modelo para un texto universitario en las ciencias de botánica o taxonomía; o para operar en el mundo de las controversias científicas que surgieran diariamente. Incorporó el lenguaje federal bajo el supuesto tradi-

---

[32] El Informe de la *OMS*, del año 1971, antes citado expresaba: "Desde el punto de vista botánico, actualmente no se reconoce más que una especie de cannabis (C. sativa L.), pero en el pasado se aplicaron a la planta otros nombres en diferentes partes del mundo (por ejemplo, C. índica y C. americana)." Pág. 6.

cional de que la referencia a la planta *Cannabis Sativa L.*, comprendía todas las plantas de marihuana conocidas.

Esta intención se desprende, además, al examinar el Art. 202 de la ley que nos ocupa, ya que bajo la Clasificación I-C se prohíbe no sólo la marihuana sino el tetrahidrocanabinol —ingrediente activo de la planta y responsable de los efectos alucinógenos—bajo el lenguaje de que ". . . se entenderán incluídos en esta clasificación [y por ende prohibidos] *cualquier material*, compuesto, mezcla o preparación que contenga . . . cualquiera de las siguientes sustancias alucinógenas. . . ." (24 L.P.R.A. sec. 2202I(c) 10 y 17). (Bastardillas nuestras.)

La interpretación aquí brindada salva cualquier reparo constitucional fundado en desigual trato de ley, ya que no es lógico pensar que la Legislatura prohibió únicamente la especie de marihuana *Cannabis sativa L.* y no aquellas otras cultivables, que mediante experimentos controlados, la ciencia taxonómica, en la época de la promulgación de la ley, no había podido incontrovertiblemente precisar e identificar como perteneciente a dicha especie o a una distinta.

Este enfoque no violenta el requisito constitucional de certidumbre ya que la palabra marihuana es lo suficientemente familiar y popular a todo el mundo([33]) y la ley suministra razonable notificación de su prohibición penal. Toma en consideración, que resulta cuestionable que una persona promedio pueda distinguir, por la apariencia física de la planta, la diferencia que existe entre una y las distintas otras posibles especies de marihuana.

------

([33]) En el medio ambiente puertorriqueño, el vocabulario del adicto con referencia a esta sustancia recoge significado especial en palabras tales como: *marihuana*—grifa, yerba, *mata*—la hoja, pasto; *la changa chicharra*—colilla del cigarrillo de marihuana; *moto, pito*—cigarrillo de marihuana. Con cierto sentido de patria, la marihuana cultivada en Puerto Rico es llamada "la jibarita". Véase: *Compendio de Estadísticas Sobre la Adicción a Drogas del Departamento de Servicios Contra la Adicción;* Apéndice (Junio 1975).

Además, cualquiera otra interpretación prácticamente imposibilitaría la persecución del delito por los agentes del orden público, ya que sin la totalidad de la planta acompañada de análisis bioquímico o espectrográfico no se podría precisar la especie en particular, lo que haría inoperante toda posible determinación de que la sustancia es *Sativa L.* en orden a un arresto bajo la norma de motivos fundados. "En otras palabras, los agentes de la policía tendrían que convertirse en botánicos expertos. De otro modo, la única evidencia de que un crimen ha sido cometido necesariamente sería inadmisible aunque posteriormente se demostrara, como cuestión de hecho, que era sativa L." *People* v. *Van Alstyne,* supra, pág. 370.

Tampoco este enfoque vulnera la regla de hermenéutica que propugna la interpretación restrictiva de los estatutos penales, ya que la misma está vinculada a que cumpla con la intención legislativa y que no conduzca a resultados o consecuencias absurdas. En *Meléndez* v. *Tribunal Superior,* 90 D.P.R. 656, 659 (1964), se hizo un recuento de nuestra doctrina sobre el principio de legalidad y se indicó: "Creemos justificado añadir que cuando los términos de un estatuto son claros y susceptibles de una interpretación *inequívoca según el significado común y corriente de sus palabras,* bajo la misma regla tampoco debemos intercalar palabras ni suplir omisiones al interpretarlo." Pág. 662. (Énfasis suplido.) El significado común y corriente de la planta marihuana al redactarse su definición estimaba correcto la existencia de una sola especie abarcándola todas. *Pueblo* v. *Mantilla,* 71 D.P.R. 36 (1950).

Es oportuno recordar los pronunciamientos en *Pueblo* v. *Tribunal Superior,* 81 D.P.R. 763, 788–789 (1961):

"No debe caerse en la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación. Como señala el maestro Jiménez de Asúa, todas las leyes, aun las 'clarísimas', requieren interpretación. 'Toda ley,

por el hecho ,de aplicarse es interpretada, ya que al cotejar su contenido con el hecho real se produce un proceso de subsunción, al que contribuyen los órganos interpretativos (a veces el legis- lador y el científico y siempre el juez), por procedimientos gra- maticales y teleológicos, y con resultados declarativos, restric- tivos, extensivos o progresivos'. En cuanto a las leyes penales 'hay que armonizar la estricta legalidad del Derecho punitivo, con la imprescindible interpretación teleológica de las normas jurídicas. Reconociendo que el Derecho Penal tiene caracteres de mayor certidumbre y estabilidad que las otras ramas, es imposible creer que la ley penal, *sensu strictu*, se basta del todo a sí misma y que sea suficiente interpretarla a la letra. No es un sistema completo y sin lagunas, de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones.'

El Tribunal Supremo federal muy recientemente ha expre- sado el mismo criterio por unanimidad. Dijo el Juez Frank- furter en *United States* v. *Shirey,* 359 U.S. 255, 260 (1959):

'Las leyes, incluyendo las penales, no son ejercicios inútiles de composición literaria. Son instrumentos de gobierno, y al in- terpretarlas "el propósito general es una ayuda mucho más im- portante para el significado que cualquier regla que puedan prescribir la gramática o la lógica formal." Esto es así porque el propósito de una ley está sumergido en sus palabras, aunque no siempre se exprese de manera pedante en las palabras. El significado de la ley, debe recordarse, es más para sentirse que para demostrarse o, como en algún sitio ha expresado el Juez Learned Hand, el arte de la interpretación es "la proliferación del propósito". Al buscar ese propósito conviene recordar que no importa la elasticidad que pueda concederse al término científico, éste no puede usarse para describir el proceso legislativo. Ese es un proceso imperfecto pero práctico, mediante el cual el ciudadano ordinario adapta los medios al propósito, excepto cuando se refiere a problemas técnicos fuera del saber ,del hom- bre promedio'. (Se han eliminado las citas.)" (Escolios omiti- dos.) ([34])

--------

([34]) El debate prevaleciente entre los científicos respecto a la especie de *Cannabis* continúa. Véase: *The Expert Witness in Narcotics Cases,* 2 Contemporary Drug Problems, págs. 81–104 (1973). Ello tiende a crear dudas entre los peritos llamados a prestar testimonio forense. Frente al

## IV

No deseo finalizar la presente sin exponer varias preocupaciones.

Desde la génesis del hombre, éste ha soñado con encontrar una sustancia "mágica y maravillosa" que le permita, aunque sea ilusoriamente, obtener lo que desea. En la consecución de dicho propósito—desde su evolución en el medio ambiente primitivo hasta la civilización moderna con sus complejos laboratorios—ha buscado, usado y experimentado continuamente con diversas sustancias vegetales y sintéticas que por sus ingredientes farmacológicos y efectos bioquímicos alteran, en mayor o menor grado y peligro, los estados de conciencia. Si una persona no logra visualizar y afrontar los problemas, traumas, realidad de la vida y el mundo como es—con sus alegrías y tristezas, miseria y opulencia, virtudes y defectos, y otras aparentes contradicciones—mediante el uso de tales sustancias invierte el proceso natural e intenta cambiarlo, modificándose él y su personalidad variando su manera de verlo, de asimilar y solucionar los problemas y sus relaciones con otras personas.

Del estudio del caso de autos es ineludible la conclusión de que la marihuana aparentemente es una de las sustancias "mágicas y maravillosas" favoritas usadas con tales propósitos que en nuestra época ha tomado auge, inclusive en un gran sector de nuestra población.

En su informe al Congreso del año 1975 el Secretario de Salud, Educación y Bienestar expresa cautela:

"La marihuana, una controversia una vez marcada por emocionalismo, está siendo examinada más concienzudamente. Se ha aprendido mucho sobre el uso de la marihuana y las consecuen-

mismo problema, otras jurisdicciones han optado por enmendar la definición intercalando las palabras "del género" (*genus*) entre las palabras *planta* y *Cannabis* y eliminando *Sativa L.* N.Y. Public Health Laws, sec. 3302 (McKinney's Consol. Laws, C. 45, Supp. (1974); Conn. Gen. State Rev. sec. 19-333(7); P.A. 74-332; Sec. 4 (Supp. 1974).

cias personales y sociales. Sin embargo, todavía queda mucho que entender. Es claro que la marihuana no es un tópico de análisis simplista." *Op. cit.,* supra, pág. VII.

Los pronunciamientos y términos de esta concurrencia han sido concebidos dentro del espíritu de cautela y evidencian la complejidad del asunto. Al inicio de la misma, y con relevancia a nuestro país, reproduje un pensamiento respecto al proceso y forjación de la opinión pública en materia de la marihuana. La responsabilidad judicial de juzgar y adjudicar los casos con absoluta ecuanimidad y estricta objetividad, no me inhibe de apreciar y estimar lo sensible y volátil de la controversia y la posibilidad de que en el futuro, en casos apropiados, el Tribunal se vea compelido a intervenir y disponer de algunas interrogantes jurídicas no planteadas ni presentes en la resolución del de autos.

Mientras tanto, debe presumirse que el debate continuará. Una opinión pública bien informada puede contribuir a una solución racional. La creación del Departamento de Servicios Contra la Adicción y los estudios sociales y científicos realizados y en proceso, en y fuera de Puerto Rico, y las alternativas humanitarias de tratamiento al trámite criminal adoptados en la Ley reflejan una mejor orientación y comprensión del problema. *Pueblo* v. *Tribunal Superior,* 104 D.P.R. 650 (1976). El fenómeno histórico, cultural, social, médico y legal que resume la complejidad de la marihuana se ha expresado del siguiente modo: "Para el agricultor, la cannabis es una cosecha de fibras; para el médico, es un enigma; para el usuario, una euforia; para el policía, una amenaza; para el traficante, una fuente de riquezas peligrosa; y para el convicto o en libertad bajo palabra y su familia, una fuente de tristeza." *Shafer Report,* pág. 3. Queda sin embargo la incógnita: ¿Cuánto tiempo deberá transcurrir para que se complete la información necesaria y se ponga fin al debate? La solución y conjugación de estas situaciones y del problema,

aunque, no es sencilla, corresponde en primera instancia a los Poderes Legislativo y Ejecutivo.