JOSÉ ACEVEDO BENÍTEZ, lesionado y recurrido, *v.* FONDO DEL SEGURO DEL ESTADO, asegurador y recurrente.

*Número:* CE-87-568    *Resuelto:* 19 de enero de 1988

*José M. Fernández Luis*, abogado del recurrente; el recurrido no compareció.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

"Este recurso tiene como trasfondo una tragedia humana. De ordinario, intuitivamente los jueces nos solidarizamos con el dolor y nos esforzamos por aliviarlo. En esos casos, para lograr el ideal de justicia, atemperamos la rigurosidad de la ley. Lamentablemente ni el más amplio liberalismo, como tampoco paternalismo judicial, nos lo permiten aquí. Después de todo, toda sentencia es 'valoración humana circunstancial'. C. Rodríguez-Aguilera, *La sentencia*, Barcelona, Ed. Bosch, 1974, pág. 87." *Díaz Marez* v. *F.S.E.*, 116 D.P.R. 50, 51 (1985).

## I

José Acevedo Benítez acudió al Fondo del Seguro del Estado (en adelante, el Fondo). Alegó que mientras se desempeñaba como taxista bajo el patronato de Miguel Ríos, en su tercer día —19 de septiembre de 1976— fue herido por un proyectil de bala que le atravesó el costado y el brazo izquierdo. Según su versión, ello ocurrió cuando un vehículo se detuvo delante del taxi que conducía. Al bajarse para cerrar la puerta del otro vehículo, se suscitó un intercambio de palabras y el otro conductor disparó. Los demás detalles de este incidente y el nombre del agresor nunca fueron esclarecidos por las autoridades.

Acevedo Benítez fue ingresado de emergencia, sometido a cirugía y recluido en el Hospital Municipal. Durante su estadía le administraron sueros, antibióticos, analgésicos y en dos (2) ocasiones *Demerol*(1) intramuscular de 50 mg. Fue dado de alta el 29 de septiembre de 1976. Al otro día, debido a una infección, acudió al Fondo y fue recluido en el Hospital Industrial. Le administraron antibióticos y se sometió a calor local. Se mostraba nervioso. Ello motivó que se pidiera una consulta psiquiátrica. Permaneció hasta el 22 de octubre. Nuevamente, al otro día sus parientes lo condujeron al Fondo por encontrarse incoherentemente desorientado y verborreico. Fue referido al *Hato Rey Psychiatric Hospital* donde estuvo hospitalizado hasta el 30 de noviembre. Allí Acevedo Benítez no evidenció enfermedad mental. Sin embargo, en la entrevista de admisión, él mismo declaró que en los últimos días había usado heroína.

El 5 de diciembre de 1976, Acevedo Benítez fue encontrado muerto en el baño de su residencia. La autopsia reveló

---

(1) Es un narcótico-analgésico cuyo nombre científico es meperidine.

que falleció por una intoxicación de morfina. Tenía un contenido de 0.10% de alcohol en la sangre.

El Fondo, previa evaluación de la psiquiatra Dra. Idalia Núñez —a los efectos de que la dependencia a las drogas de Acevedo Benítez no guardaba relación alguna con el accidente— decidió que su muerte no era compensable. No obstante, el Fondo procedió a distribuir entre sus beneficiarios los remanentes de beneficios que no pudo entregar en vida del infortunado.

Inconformes, sus beneficiarios apelaron a la Comisión Industrial (en adelante, Comisión). Allí, en apoyo del recurso, declararon Alicia Marcón Rivera y Filomena Benítez —esposa y madre, respectivamente, de Acevedo Benítez— quienes, en síntesis, atestaron que antes del accidente no ingería bebidas alcohólicas en exceso ni utilizaba drogas.

Por el Fondo prestaron testimonio varios peritos. La Dra. Ozema Mirabal, psiquiatra, expresó su criterio negativo en cuanto a relación causal entre el accidente y el fallecimiento. Fundó su decisión en que durante la hospitalización de Acevedo Benítez sólo le administraron dos inyecciones de *Demerol*, dosis no susceptibles de crear hábito de adicción.

El patólogo Dr. Román Franco —Director del Centro de Cáncer y catedrático universitario— opinó categóricamente que Acevedo Benítez era adicto a drogas desde mucho antes del accidente. Se fundó en los hallazgos de la autopsia, en particular, la esclerosis venosa peculiar que presentaba en ambos brazos, daño al hígado y al sistema inmunológico. Explicó con lujo de detalles que estas características son de adictos crónicos e indicativas de uso prolongado de narcóticos. A juicio suyo, el *Demerol* no causó la adicción. Su muerte fue precipitada por un choque anafiláctico severo del paciente a los contaminantes del narcótico o una reacción alérgica al narcótico, o ambas cosas.

En fin, atestó el Dr. Jorge L. Suria Colón, psiquiatra de la Comisión. Opinó que como Acevedo Benítez trabajaba, debió estar en "un período de remisión" al sufrir el accidente. El agobio emocional y las tensiones causadas por ese accidente le llevaron de nuevo al uso de los narcóticos.

En resumen, la prueba pericial únicamente reveló: (1) que Acevedo Benítez era un adicto a las sustancias controladas *antes* del accidente; (2) que durante sus hospitalizaciones los medicamentos que se le administraron no fueron científicamente adictivos, y (3) su muerte fue el resultado del uso ilegal de una sustancia controlada al mezclarla con alcohol. Aun así, dicho foro declaró compensable su muerte. A solicitud del Fondo revisamos.

## II

■■ Erró la Comisión. Por dos razones, la trágica muerte de Acevedo Benítez no es compensable. Primero, no estamos propiamente ante un accidente laboral. Por su condición de adicto a drogas, la muerte de Acevedo Benítez fue a causa de *una sobredosis administrada en el cuarto de baño*. El testimonio del doctor Suria, el cual representa la opinión de la Comisión, es especulativo y su valor probatorio, mínimo.[2] *Mejías Román* v. *Comisión Industrial*, 111 D.P.R. 629, 633 (1981).

Su adicción fue anterior al accidente. Así lo demostró la autopsia que reflejó la esclerosis venosa en ambos brazos, que constituye una condición típica de los adictos a los opiáceos. La opinión pericial fue unánime respecto a que los me-

---

[2] Ciertamente la prueba no demostró que estuviese en remisión. Tampoco de que hubiese recibido tratamiento profesional para desintoxicación. Ello proyecta las afirmaciones del doctor Suria en el plano de lo conjetural. Igual sucede con la especulación de que Acevedo Benítez estaba en remisión por estar trabajando. Difícilmente podemos sostener la premisa de que el trabajo necesariamente excluye el uso de narcóticos.

dicamentos administrados durante sus estadías en los hospitales no tuvieron que ver con su adicción. Por ser sumamente ilustrativo, reproducimos el testimonio del doctor Franco:

El paciente tiene Esclerosis de las venas antecubitales. Esto es muy frecuente en pacientes que son adictos crónicos y que es lo que en inglés llaman "main liners", o sea, que se inyectan por vía endovenosa substancias. La Esclerosis o engrosamiento y endurecimiento es producto, no de las inyecciones repetidas, sino de las inflamaciones repetidas que están ocurriendo en esas venas. Por el hecho de que dado la realidad de que esto es un acto ilícito, muchas veces se utilizan agujas que no están estériles, que han sido utilizadas por otras personas o que no son las indicadas para administrarse substancias endovenosamente. De hecho, parte grave del problema de "Aids" es que el compartir agujas entre adictos es lo que lleva al contagio de un paciente a otro, con virus de "Aids" y con virus de Hepatitis. El hecho de que el paciente tenga una respuesta adversa inmunológica a Morfina, es evidencia clara de unas exposiciones previas. El hecho de que el paciente tenga una Esclerosis de venas anticubitales es evidencia clara de que estas exposiciones previas, no han sido ni ocasionales, ni han sido de origen reciente de una, dos o tres semanas, sino que han sido producto de meses de estarse inyectando substancias por vía endovenosa. Particularmente cuando la tendencia en estas personas es rotar las venas. Usualmente tarda seis, doce meses, o sea tardan en desarrollarlo, pero una vez se desarrolla es bien claro para el patólogo que examina cuando esto ocurre.

Cabe reseñar el hecho de que el patólogo cuando observa venas esclerosadas, es porque son claramente escleróticas, porque la vena en el difunto se colaxa y no se hace evidente. Mientras que en estos pacientes se observan como unos cordones bien gruesos en la región antecubital y si se hubiese examinado quizás la boca, etc. se hubies[e] encontrado otras, porque se utilizan divers[o]s portales de entrada. Que el paciente tiene hallazgos que sugieren problemas de alergia ya, o sea, de que está sensi[bilizado] y está respondiendo, lo es el hecho de que en un examen de sangre del día 9 de septiembre de 1976, tiene marginalmente elevados los geosinófilos[, q]ue

son unas células de la sangre que aumentan en número cuando la persona está con fenómenos alérgicos. Adicionalmente, en 24 de noviembre de 1976, el paciente tiene evidencia de lesión al hígado. Casi el noventa por ciento de los pacientes que son usuarios habituales de drogas tienen una Hepatitis crónica o granulomatosa, por la inyección por la vena, no s[ó]lo de la droga, sino de otros contaminantes.

Este testimonio está avalado en la profusa literatura que hay al respecto. W.U. Spitz y R.S. Fisher (eds.), *Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation*, 2da ed., Springfield, Charles C. Thomas, 1980, págs. 541–548; Gradwohl, R.H. Rutherford, *Gradwohl's Legal Medicine*, 3ra ed., Bristol, John Wright & Sons, 1976, págs. 242, 579–581; E. Astolfi, C. Gotelli, J. Kiss, J. López Bolado, A. Maccagno y V.L. Poggi, *Toxicomanías*, Buenos Aires, Ed. Universidad, 1979, págs. 124–126; N. Bejerot, *Addiction & Society*, Springfield, Charles C. Thomas, 1970, págs. 30–35; *Pueblo* v. *Ortiz Pepín*, 105 D.P.R. 547, 552, 577–578 (1977), opinión concurrente del Juez Asociado Señor Negrón García.

■ Y segundo, independientemente de que no existe relación causal, en este caso la muerte por sobredosis voluntaria de morfina no es compensable de acuerdo con lo dispuesto en la ley que nos ocupa. Ello late en la Ley de Sustancias Controladas de Puerto Rico que prohíbe el uso ilegal de tales sustancias, 24 L.P.R.A. sec. 2101 *et seq.*, cuyo tráfico hemos caracterizado como "dañino y perverso", destructor de vidas humanas. *Pueblo* v. *López Rivera*, 91 D.P.R. 693, 703 (1965); *Pueblo* v. *Rosa Burgos*, 103 D.P.R. 478 (1975).

En resumen, la acción que causó la muerte de Acevedo Benítez fue un acto autoinfligido resultante de la comisión de un delito. En estas circunstancias rige la doctrina de *Díaz Marez* v. *F.S.E.*, supra, págs. 54–55. La ley es clara y mandatoria. "No son accidentes compensables del trabajo y no da-

rán[,] por consiguiente, derecho a compensación al obrero o empleado o a sus beneficiarios . . . los que ocurren . . . [a]l tratar el obrero o empleado de cometer un delito . . . o cuando voluntariamente se causare la lesión." 11 L.P.R.A. sec. 5.

*Se dictará sentencia y se revocará a la Comisión Industrial.*